## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| ZACHARY GALICKI, et al., | Civil Action No. 14-169 (JLL) |
|---|---|
| Plaintiffs, | |
| v. | **OPINION** |
| STATE OF NEW JERSEY, | |
| Defendants. | |
| GW CAR SERVICE, LLC, et al., | |
| Plaintiffs, | |
| v. | |
| STATE OF NEW JERSEY, et al., | |
| Defendants. | |

## LINARES, District Judge.

This civil action arises out of the closure of multiple lanes of traffic to the George
Washington Bridge ("GWB") from September 9, 2013, through September 13, 2013, and is before
the Court by way of Motions to Dismiss Plaintiffs' Second Consolidated Class Action Amended
Complaint ("SAC") filed by the Port Authority of New York & New Jersey (the "Port Authority"),
David Wildstein ("Wildstein"), Chris Christie for Governor, Inc. ("Chris Christie for Governor"
or "CCFG"), the State of New Jersey (the "State" or "New Jersey") & Michael Drewniak
("Drewniak"), and Bill Baroni ("Baroni") (collectively, "Defendants") pursuant to Federal Rule

of Civil Procedure 12(b)(6).  (ECF Nos. 159, 160, 161, 162, and 164, respectively.)[1]  The Court has considered the parties' submissions and decides this matter without oral argument pursuant to Federal Rule of Civil Procedure 78.  For the reasons set forth below, Defendants' Motions to Dismiss are granted in part and denied in part.

## BACKGROUND

On January 9, 2014, the Law Offices of Rosemarie Arnold initiated this action on behalf of plaintiffs Zachary Galicki, Joy Galicki, Eli Galicki, Robert Arnold, Kim Joscelyn, Elizabeth Psaltos, individually and on behalf of all others similarly situated (the "Galicki Plaintiffs") in this Court.  (ECF No. 1.)  Separately, on January 13, 2014, the Epstein Law Firm filed a lawsuit in New Jersey Superior Court on behalf of GW Car Service, LLC, Lime Taxi, LLC, Palisades Enterprises LLC, Fort Lee Car Service LLC, Vans R Us, Bergen Transportation Services, Inc., Robert Cohen, Joan Cohen, and Victor Cataldo, individually and on behalf of all others similarly situated (the "GW Plaintiffs"), which was removed to the United States District Court for the District of New Jersey on February 28, 2014.  (*See* ECF No. 1, Civil Action No. 14-1319-WHW (D.N.J.).)

On March 24, 2014, the Galicki Plaintiffs filed a motion to consolidate the two cases (ECF No. 39), which was granted on August 8, 2014 by United States Magistrate Judge Joseph A. Dickson.  (ECF Nos. 57, 58.)  Thereafter, the Law Offices of Rosemarie Arnold and the Epstein Law Firm filed competing applications to be named interim class counsel.  (ECF Nos. 63, 65.)  On

---

[1] Also before the Court is a renewed Motion by the State and Drewniak to deny class certification (ECF No. 163), which Port Authority joined (*see* Letter dated Jan. 18, 2016, ECF No. 168).  The Court once again denies this motion as premature.  As the Court previously stated, "Defendants are invited to renew their motion after Plaintiffs have filed an amended complaint and *discovery has proceeded.*" (ECF No. 123 at 1-2 n.1 (emphasis added).)

October 6, 2014, this Court appointed the Epstein Law Firm as interim class counsel. (ECF Nos. 66, 67.)

On December 19, 2014, the GW Plaintiffs filed a proposed Class Action Complaint asserting numerous claims sounding in tort and civil rights violations as against the State, CCFG, the Port Authority, Bridget Anne Kelly, Michael Drewniak, David Wildstein, Bill Baroni, Bill Stepien, as well as fictitious, and as yet unknown, individuals and corporations. (ECF No. 71, Consolidated Class Action Amended Complaint ("CAC").) On February 23, 2015, Defendants moved to dismiss the CAC in its entirety. (*See* ECF Nos. 84, 86, 87, 88, 89.)

On June 29, 2015, the Court granted the motions to dismiss the CAC. (*See* ECF Nos. 123 (6/29/15 Op.) and 124 (6/29/15 Order).) The "overarching defect" of the CAC was "the lack of any substantive facts concerning each Defendant's role . . . ." (6/29/15 Op. at 5.) Ultimately, the Court dismissed the following counts *with* prejudice as to all Defendants: Two (42 U.S.C. § 1985), Three (42 U.S.C. § 1986), and Five (42 U.S.C. § 1988). In addition, Counts One (42 U.S.C. § 1983) and Four (Vicarious Liability / Governmental Responsibility) were dismissed with prejudice as to the State, and Count Four was dismissed with prejudice as to CCFG. (*See* 6/29/15 Op.) The remaining counts (including Counts One and Four as to the other Defendants) were dismissed *without* prejudice, and the Court permitted Plaintiffs leave to amend. *Id.*

On August 6, 2015, Plaintiffs[2] filed the SAC on behalf of a putative class.[3] (ECF No. 127.) As explained in detail, *infra*, the SAC alleges numerous claims sounding in tort and civil rights

---

[2] For simplicity, the Court's reference to "Plaintiffs" in this opinion includes both the named GW Plaintiffs and purported class members, except as otherwise noted.

[3] Plaintiffs propose to represent a class of "thousands," consisting of "all persons who are [United States] residents . . . who were forced to suffer extreme traffic delays and to be confined in their cars, waste gas, lose time and sustain other economic losses on September 9, 2013, September 10, 2013, September 11, 2013, September 12, 2013 and/or September 13, 2013 when they traveled in, through or around the Borough of Fort Lee, New Jersey and/or

3

violations as against the State, CCFG, the Port Authority (collectively the "Entity Defendants"),

Bridget Anne Kelly, Michael Drewniak, David Wildstein, Bill Baroni (collectively the "Individual

Defendants"[4]), as well as fictitious, and as yet unknown, individuals and corporations.

Specifically, the SAC alleges ten counts as follows:

Count One:    42 U.S.C. § 1983 against Kelly, in her individual capacity, Drewniak, in his
              individual capacity, Wildstein, Baroni, CCFG, and Port Authority (¶¶ 290–
              311)

Count Two:    Governmental Responsibility pursuant to 42 U.S.C. § 1983 against Port
              Authority only (¶¶ 312–19)

Count Three:  N.J.S.A. § 2C:41–1 et seq., New Jersey Racketeer Influenced and Corrupt
              Organizations Act ("NJ RICO") against all Defendants (¶¶ 320–73)

Count Four:   N.J.S.A. § 10:6–1 et seq., New Jersey Civil Rights Act ("NJCRA") against
              Kelly, in her individual and/or official capacity, Drewniak, in his individual
              and/or official capacity, Wildstein, Baroni, Port Authority, CCFG, and the
              State (¶¶ 374–94)

Count Five:   Governmental Responsibility pursuant to the NJCRA against the State and
              Port Authority (¶¶ 395–408)

---

when they attempted to access the George Washington Bridge from the dedicated Fort Lee access lanes and cross the
bridge from New Jersey to New York." (SAC ¶¶ 278, 283). The SAC also proposes four subclasses:

(i)     "class members who drove their cars in New Jersey, attempted to access the George Washington Bridge
        from the dedicated Fort Lee access lanes, were stuck in extreme traffic and delays in New Jersey, and
        paid a toll for the George Washington Bridge on September 9, 2013, September 10, 2013, September
        11, 2013, September 12, 2013 and/or September 13, 2013" (¶ 279);
(ii)    "class members who were passengers in cars being operated in New Jersey which attempted to access
        the George Washington Bridge from the dedicated Fort Lee access lanes, were stuck in extreme traffic
        and delays in New Jersey, and paid a toll for the George Washington Bridge on September 9, 2013,
        September 10, 2013, September 11, 2013, September 12, 2013 and/or September 13, 2013" (¶ 280);
(iii)   "class members who drove their cars in New Jersey, traveled in, through or around the Borough of Fort
        Lee, New Jersey on September 9, 2013, September 10, 2013, September 11, 2013, September 12, 2013
        and/or September 13, 2013, and were stuck in extreme traffic and delays in the Borough of Fort Lee,
        New Jersey" (¶ 281);
(iv)    "class members who were passengers in cars being operated in New Jersey which traveled in, through
        or around the Borough of Fort Lee, New Jersey on September 9, 2013, September 10, 2013, September
        11, 2013, September 12, 2013 and/or September 13, 2013, and were stuck in extreme traffic and delays
        in the Borough of Fort Lee, New Jersey" (¶ 282).

[4] On the same day they filed the SAC, Plaintiffs filed a stipulation of dismissal as to Bill Stepien only (ECF No. 128),
which was signed by this Court on August 11, 2015. (ECF No. 129.) Accordingly, Bill Stepien is not named as a
Defendant in the SAC.

Count Six:     Common Law Civil Conspiracy against all Defendants (¶¶ 409–25)

Count Seven: N.J.S.A. § 56:8–1 et seq., New Jersey Consumer Fraud Act ("NJ CFA")
               against Wildstein, Baroni, and Port Authority (¶¶ 426–44)

Count Eight:   Breach of Contract and Implied Covenant of Good Faith and Fair Dealing
               against Port Authority (¶¶ 445–55)

Count Nine:    Tortious Interference against Kelly, Drewniak, Wildstein, Baroni, CCFG,
               and the State (¶¶ 456–70) (alleged for the first time in the SAC)

Count Ten:     Respondeat Superior against the State, CCFG, and Port Authority (¶¶ 471–
               78)

Currently before the Court are Motions to Dismiss the SAC pursuant to Rule 12(b)(6) by

Defendants Port Authority, Wildstein, CCFG, the State & Drewniak, and Baroni, filed on

December 29, 2015. (*See* ECF Nos. 159-1 ("PA Mov. Br."), 160-1 ("Wildstein Mov. Br."), 161-

1 ("CCFG Mov. Br."), 162-1 ("NJ&MD Mov. Br."), and 164-1 ("Baroni Mov. Br."),

respectively.)[5]  On March 7, 2016, Plaintiffs filed an omnibus opposition brief. (ECF No. 171

("Pl. Opp. Br.").) Defendants, with the exception of Wildstein, replied on April 25, 2016. (ECF

Nos. 175 ("NJ&MD Reply"), 177 ("Baroni Reply"), 178 ("CCFG Reply"), 179 ("PA Reply").)

The Motions to Dismiss the SAC are now ripe for resolution.[6]

---

[5] Kelly has not appeared in this action since its inception, and on May 4, 2015, the Clerk entered default as to her. Accordingly, Kelly has not moved to dismiss the SAC.

[6] Related to the civil action before this Court are the criminal proceedings currently pending before United States District Court Judge Susan D. Wigenton, which are based on the same underlying facts. (*See* Criminal Nos. 15-193 and 15-209 (D.N.J.).) On April 23, 2015, while the motions to dismiss the CAC were pending, Baroni and Kelly were indicted by the United States Attorney's Office for the District of New Jersey ("USAO") on charges of conspiracy, fraud, and civil rights violations for their alleged roles in the GWB lane closures. (*See* Criminal No. 15-193-SDW, ECF No. 1.) On May 1, 2015, Wildstein pled guilty to a two-count information, which similarly alleges a conspiracy and civil rights violations in connection with the September 2013 GWB lane closings. (*See* Criminal No. 15-209-SDW, ECF Nos. 1 and 3.)

   In light of these criminal proceedings, on September 16, 2015 (approximately five weeks after Plaintiffs filed the SAC and before Defendants filed the pending Motions to Dismiss), the United States Attorney's Office for the District of New Jersey filed a motion to intervene and for a stay in this action. (ECF No. 140.) On October 26, 2015, this Court granted the motion to intervene, but denied the request for a stay *without* prejudice. (ECF Nos. 147 and 148.)

## LEGAL STANDARD

To withstand a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

To determine the sufficiency of a complaint under *Twombly* and *Iqbal* in the Third Circuit, the court must take three steps: first, the court must take note of the elements the plaintiff must plead to state a claim; second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth; finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief. *See Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (citations and internal quotations omitted). Stated differently, the Court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Grp. Against Smog & Pollution, Inc. v. Shenango Inc.*, 810 F.3d 116, 127 (3d Cir. 2016) (quoting *Eid v. Thompson*, 740 F.3d 118, 122 (3d Cir. 2014)) (internal quotations omitted).

---

Separately, on June 13, 2016, United States District Court Judge Susan D. Wigenton denied Baroni and Kelly's Motions to Dismiss the criminal indictments. (See Criminal No. 15-193-SDW, ECF Nos. 126 and 127.) As of this writing, the charges against Baroni and Kelly remain pending.

6

The Court's role is not to determine whether the non-moving party "will ultimately prevail" but whether that party is "entitled to offer evidence to support the claims." *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 302 (3d Cir. 2011). The Court's analysis is a context-specific task requiring the court "to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of the public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

## DISCUSSION[7]

In this section the Court discusses each cause of action alleged in the SAC. As explained in detail below, the Court generally concludes that the claims asserting violation of constitutional rights and civil conspiracy (Counts One, Two, Four, Five, and Six) are sufficiently alleged to proceed in some fashion. However, the remaining claims (Counts Three, Seven, Eight, Nine, and Ten) fail to state a claim for relief and shall be dismissed.

**A. Counts One and Two – Violation of 42 U.S.C. § 1983 (Count One) and "Governmental Responsibility" under § 1983 (Count Two)**

A plaintiff may have a cause of action under 42 U.S.C. § 1983 for certain violations of his constitutional rights. Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable

---

[7] The facts alleged in the SAC are accepted as true solely for the purposes of these motions. *See Alston v. Countrywide Fin. Corp.*, 585 F.3d 753, 758 (3d Cir. 2009) (noting that in deciding a Rule 12 motion, the court must "accept as true plaintiffs' material allegations, and construe the complaint in the light most favorable to them").

> to the party injured in an action at law, suit in equity, or other proper
> proceeding for redress . . . .

42 U.S.C. § 1983. Thus, to establish a cause of action under Section 1983, a plaintiff must demonstrate that: (1) there was a violation of a right secured by the Constitution and laws of the United States, and (2) the alleged violation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988) (citations omitted).

The Court previously dismissed the Section 1983 claim under Rule 8 for failure to give adequate notice. (6/29/15 Op. at 5–7 (noting that the "CAC lacks any meaningful facts which establish each individual Defendant's liability for the misconduct alleged").) The Court briefly touched on other arguments raised by Defendants—such as whether Defendants were state actors and whether Plaintiff had alleged violation of constitutional rights—but did not substantively address them. (*Id.* at 7–9.) This claim was dismissed *with* prejudice as to the State (since Plaintiffs conceded that it was not an appropriate Defendant) but was dismissed *without* prejudice as to the remaining Defendants.

Likewise, the Court previously dismissed the related "governmental responsibility" Section 1983 claim, noting that "[i]n the absence of a valid § 1983 claim, there can be no *respondeat superior* liability" and further remarking that, as pled in the CAC, the claim "merely recite[d] the legal standard via conclusory allegations and provide[d] no facts to substantiate such a claim." (6/29/15 Op. at 12.) Although in the CAC the "governmental responsibility" claim was asserted against the State, CCFG, and Port Authority, the Court granted leave to amend with respect to Port Authority only, since Plaintiffs had abandoned this claim against the State and CCFG. (*Id.*)

8

In Count One of the SAC, Plaintiffs allege that Defendant Kelly, in her individual capacity, Defendant Drewniak, in his individual capacity, Defendant Wildstein, Defendant Baroni, Defendant CCFG, and Defendant Port Authority violated 42 U.S.C. § 1983 by depriving Plaintiffs and the Plaintiff class members of their federal constitutional rights. (SAC ¶¶ 290–311). In Count Two, Plaintiffs allege that Port Authority is "responsible for" Baroni and Wildstein's constitutional violations because their actions constituted "policy and/or custom" of Port Authority, and also because Port Authority "failed to train and/or supervise" them. (SAC ¶¶ 315–17.)

As explained below, the Court finds that Plaintiffs have sufficiently stated a claim to survive the instant motions to dismiss. This section proceeds in three parts. First, the Court determines that all of the named Defendants were "acting under color of state law." In part two, the Court concludes that Plaintiffs have sufficiently alleged violation of a constitutional right. Finally, the Court finds that Baroni and Drewniak are not entitled to qualified immunity.

In sum, the Section 1983 claims shall proceed against the Individual Defendants (*i.e.*, Kelly, Drewniak, Baroni, and Wildstein) in their individual capacities, plus CCFG and Port Authority. With respect to Port Authority (Counts One and Two), the Section 1983 claim shall proceed only to the extent it is premised on Wildstein and Baroni's possession of "final policymaking authority," but shall be dismissed *with prejudice* to the extent it is premised on a failure to train.

1.  The SAC Sufficiently Alleges That the Violation Was Committed by Persons Acting Under Color of State Law

"To satisfy the state action requirement, the defendant must have used authority derived from the state in causing the alleged harm." *Harvey v. Plains Twp. Police Dep't*, 421 F.3d 185, 189 (3d Cir. 2005) (citing *Abbott v. Latshaw*, 164 F.3d 141, 146 (3d Cir. 1998)). Accepting all

9

factual allegations as true—as it must at this juncture—the Court concludes that Plaintiffs have adequately pleaded that all of the named Defendants were "acting under color of state law" in connection with the alleged violation of 42 U.S.C. § 1983.

### a. Defendants Kelly and Drewniak

Count One names Kelly and Drewniak as Defendants in their individual capacities. (See SAC ¶ 292.) There is no serious dispute that these Defendants were acting under color of state law, since it is alleged that they were both employees of the State of New Jersey at the relevant times.

For example, the SAC specifically alleges that Kelly, "during all relevant times stated herein, was an employee of defendant New Jersey, was the Deputy Chief of Staff to Governor Christie, and was an agent of defendant Chris Christie for Governor." (SAC ¶ 21.) The SAC further notes that Kelly served as the Deputy Chief of Staff for the office of Legislative and Intergovernmental Affairs ("IGA"),[8] and that she also "participated in campaign business" on behalf of Defendant Chris Christie for Governor. (Id. ¶¶ 47, 52.) The SAC details specific actions taken by Kelly while an employee of the State. (See, e.g., id. ¶¶ 81–85, 95–97, 129, 134, 157–59.)[9] With respect to Drewniak, the SAC specifically alleges that he "was an employee of defendant New Jersey, was the Spokesperson for and/or Press Secretary to Governor Christie, and was an agent of defendant Chris Christie for Governor." (SAC ¶ 22; see also id. ¶ 55 (alleging that Drewniak "promoted and acted on behalf of" CCFG).) The SAC identifies Drewniak's alleged

---

[8] The IGA "was a component of [Governor Christie's] Office that monitored and facilitated the relationships between the Governor's Office and . . . state and local officials." (SAC ¶ 42) (citation omitted).

[9] As noted previously, default has been entered against Kelly and she accordingly does not move to dismiss the SAC.

actions and involvement while an employee of the State. (*See, e.g., id.* ¶¶ 80, 87, 88, 91–94, 101, 103, 105, 117, 135, 158, 161, 162, 175, 186.)[10]

The Court thus concludes that the SAC sufficiently alleges that Kelly and Drewniak, in their individual capacities, acted under state law for purposes of the Section 1983 claim. *See Slinger v. N.J.*, 366 F. App'x 357, 360 (3d Cir. 2010) (holding that "the Eleventh Amendment does not bar suits brought against state officials in their individual capacities, even if the actions which are the subject of the suit were part of their official duties") (citing *Hafer v. Melo*, 502 U.S. 21, 30, 31 (1991)).

### b. *Defendants Wildstein and Baroni*

The SAC sufficiently alleges that Wildstein and Baroni acted under color of state law in their "individual capacity," but fails to state an "official capacity" claim.

The SAC alleges that both Wildstein and Baroni, "during all relevant times," were employees of Defendant Port Authority, appointees of Governor Christie, and agents of Defendant Chris Christie for Governor. (SAC ¶¶ 23, 34; *see also id.* ¶ 55 (alleging that Wildstein and Baroni "promoted and acted on behalf of" CCFG).) Baroni was appointed by Governor Christie in February 2010 to serve as the Port Authority's Deputy Executive Director. (*Id.* ¶¶ 34, 35.) Thereafter, Baroni hired Wildstein to serve as Director of Interstate Capital Projects for the Port Authority; notwithstanding his title, Wildstein operated as Baroni's chief-of-staff. (*Id.* ¶¶ 36, 38.)

---

[10] Drewniak does not specifically argue that the SAC fails to allege that he acted under color of state law, but more generally moves to dismiss all counts asserted against him (One, Three, Four, Six, and Nine) on grounds that the SAC's allegations do not meet the *Twiqbal* pleading requirements. According to Drewniak, there are no facts alleged from which the Court could "reasonably infer" that Drewniak committed wrongdoing; rather, he contends that the alternative interpretation of the facts—that he was unaware of the efforts to close the lanes and of the cover story—is more plausible than an inference that he engaged in any wrongdoing. (NJ&MD Mov. Br. at 12–18.) The Court disagrees and finds that when accepting all factual allegations as true and construing them in a light most favorable to Plaintiff, the SAC demonstrates a plausible entitlement to relief as to Drewniak.

Both Wildstein and Baroni resigned their positions in December 2013. (*Id.* ¶¶ 34, 37.) The SAC details specific actions taken by Wildstein and Baroni while employed by the Port Authority. (*See, e.g., id.* ¶¶ 80, 82, 86, 88–94, 100–07, 112–69.)

Both Wildstein and Baroni argue that Count One must be dismissed because the SAC fails to state whether they are being sued in their official or individual capacity, and the Court should presume that they are being sued only in their official capacities. (Wildstein Mov. Br. at 6; Baroni Mov. Br. at 9–10.)[11] In opposition, Plaintiffs contend that it is "clear" that the Section 1983 claims apply to Wildstein and Baroni in both their individual and official capacities. (Pl. Opp. Br. at 48–49.) Viewing the SAC in a light most favorable to Plaintiffs, the Court shall construe it as asserting the Section 1983 claims against Wildstein and Baroni in both their individual and official capacities.

The SAC sufficiently alleges that Wildstein and Baroni acted under color of state law in their individual capacities. "[T]he Port Authority has been recognized as a state agency performing functions on behalf of the state." *Bunk v. Port Auth. of N.Y. & N.J.*, 144 N.J. 176, 186–87 (1996) (citation and internal quotation marks omitted); *see also Slinger*, 366 F. App'x at 360 (holding that "the Eleventh Amendment does not bar suits brought against state officials in their individual

---

[11] Baroni further argues that Count One should be dismissed since Plaintiffs failed to allege specific facts on causation or damages. (Baroni Mov. Br. at 17–18.) However, Plaintiffs specifically allege that the lane closures caused them to "sustain various damages including but not limited to loss of time, gas, and wages that cannot be reclaimed, other economic losses such as payment of tolls under false pretenses, to be falsely imprisoned and/or restrained in their vehicles, and to suffer emotional damages." (SAC ¶ 308.) Although Baroni's point is well-taken that at this stage some details are lacking—*i.e.*, how the Taxi Plaintiffs get passengers, how many passengers they picked up, if any, in Fort Lee on any of the five days, how that number differed, if at all, from ordinary days, whether the traffic allowed them to charge passengers more than usual as they sat in traffic, whether overall fares were lower or higher on other days, or even whether they paid a toll and crossed the GWB—the Court finds that these are issues that require discovery to resolve. At this early stage, Plaintiffs have sufficiently alleged that they were stuck in the traffic caused as a result of the lane closures and that they suffered damages as a result.

capacities, even if the actions which are the subject of the suit were part of their official duties") (citation omitted).

However, to the extent that the Section 1983 claim seeks relief against Wildstein and Baroni in their official capacities, it must be dismissed. Indeed, it is "clear that a state employee may be sued in his official capacity only for 'prospective' injunctive relief, because 'official-capacity actions for prospective relief are not treated as actions against the State.'" *Iles v. de Jongh*, 638 F.3d 169, 177 (3d Cir. 2011) (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989)) (internal citation omitted). To determine whether a plaintiff has adequately stated a claim for prospective injunctive relief against a state employee acting in her official capacity, the Court must determine whether the complaint alleges an "ongoing violation" of the law and "seeks relief properly characterized as prospective." *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (citation and internal quotation marks omitted).

Here, Plaintiff acknowledges that Wildstein and Baroni resigned their positions with the Port Authority in December 2013. (SAC ¶¶ 34, 37.) And even though Fed. R. Civ. P. 25(d) provides that "when a public officer who is a party in an official capacity . . . resigns, or otherwise ceases to hold office while the action is pending[,] [t]he officer's successor is automatically substituted as a party[,]" Plaintiff has not alleged an ongoing violation. Accordingly, to the extent the Section 1983 claims seeks relief against officials of the Port Authority acting in their official capacity, it fails to state a claim upon which relief can be granted. In other words, it would be futile to permit Plaintiffs to name the current holders of the offices within the Port Authority because Plaintiffs cannot allege that the violations are ongoing.

In sum, the Court concludes that Plaintiffs have sufficiently alleged that Wildstein and Baroni were acting under color of state law in their individual capacities, but that the Section 1983

13

claim must be dismissed *with* prejudice to the extent it seeks official capacity relief against Port Authority officials.

### c. Port Authority

In Count One, the SAC alleges that "Port Authority, through defendants Wildstein and Baroni, effectuated the lane and toll booth reductions." (SAC ¶ 294.) Similarly, in Count Two of the SAC, Plaintiffs allege that Port Authority is "responsible for" Baroni and Wildstein's constitutional violations because their actions—as a result of their "high level positions, influence and connection with Governor Christie"—constituted "policy and/or custom" of Port Authority, and also because Port Authority "failed to train and/or supervise" them, which "constituted deliberate indifference to plaintiffs and members of the plaintiff class." (*Id.* ¶¶ 315–17.)

As an initial matter, the Court notes that Section 1983 claims against the Port Authority are analyzed under a municipal liability framework. *See Mack v. Port Auth. of N.Y. & N.J.*, 225 F. Supp. 2d 376, 383 n.7 (S.D.N.Y. 2002) ("Although the Port Authority, a bi-state agency, is not technically a municipality, courts have treated it as such and have analyzed claims against it under the standards governing municipal liability under Section 1983.")

In order to state a claim of governmental liability under Section 1983, a plaintiff must include in their complaint allegations asserting that the governmental entity has adopted a policy or custom which, "whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694; *see also Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996) (noting that a governmental entity may be held liable where "the alleged constitutional transgression implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted by custom") (citing

14

*Monell*, 436 U.S. at 658). The term "policy" includes "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690. "A custom, on the other hand, need not have received formal approval through official decision-making channels, but it 'must have the force of law by virtue of the persistent practices' of the municipal officials." *Smith v. Luzerne Cty. FBI Agency*, 517 F. App'x 65, 66 (3d Cir. 2013) (quoting *Brown v. Muhlenberg Twp.*, 269 F.2d 205, 215 (3d Cir. 2001)). Furthermore, a governmental entity's failure to properly train or supervise its employees can amount to a "custom" that will trigger Section 1983 liability, but "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the [state actors] come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *see also Reitz v. Cty. of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997) ("Establishing municipal liability on a failure to train claim under § 1983 is difficult.").

The Court shall grant Port Authority's Motion to Dismiss to the extent Plaintiff's Section 1983 claims are premised on a failure to train, but finds it premature to decide the issue of whether Wildstein and Baroni possessed "final policymaking authority."

### i. Failure to Train

With respect to a failure to train claim, a plaintiff "must identify a failure to provide specific training that has a causal nexus with their injuries and must demonstrate that the absence of that specific training can reasonably be said to reflect a deliberate indifference to whether the alleged constitutional deprivations occurred." *Reitz*, 125 F.3d at 145. In other words, a plaintiff must establish "a background of events and circumstances which establish that the 'policy of inaction' is the functional equivalent of a decision by the city itself to violate the Constitution." *City of Canton*, 489 U.S. at 394–95 (O'Connor, J., concurring). "Without some form of notice to the city,

15

and the opportunity to conform to constitutional dictates both what it does and what it chooses not to do, the failure to train theory of liability could completely engulf *Monell*." *Id.* at 395.

Port Authority argues that the September 2013 GWB lane closures constitute an "isolated and unfortunate incident" and that Plaintiffs have failed to allege "deliberate indifference"—*i.e.*, that Port Authority was aware of past violations and failed to take precautions. (PA Mov. Br. at 13–14.)

Plaintiffs appear to have abandoned any claim that Port Authority's liability can be premised on a failure to train, as they fail to address this in their opposition brief. In any event, it is clear that Plaintiffs do not plead facts that identify Port Authority's alleged failure to provide specific training, and thus they cannot show how such a failure to provide specific training rises to the level of a deliberate indifference. Indeed, Plaintiffs merely allege that "Port Authority failed to train and/or supervise the individual defendants, and same constituted deliberate indifference to plaintiffs and members of the plaintiff class" and that "[a]s a result thereof, plaintiffs and the members of the plaintiff class suffered the damages alleged herein." (SAC ¶¶ 317, 318.) These entirely conclusory allegations are not sufficient to pass muster. And because Plaintiffs appear to have abandoned this theory of liability, the Court dismisses Count Two against Port Authority *with prejudice*, to the extent it is premised on an alleged failure to train.

### ii. Final Policymaking Authority

"To satisfy the pleading standard, [a plaintiff] must identify a custom or policy, and specify what exactly that custom or policy was." *McTernan v. City of York, PA*, 564 F.3d 636, 658 (3d Cir. 2009) (internal citations omitted). A governmental entity may be held responsible for a single decision made by an employee of the governmental entity, but only where that employee had "final policymaking authority" in that area of the government's business. *City of St. Louis v. Praprotnik*,

16

485 U.S. 112, 123 (1988) (citing *Owen v. City of Independence*, 445 U.S. 622 (1980); *Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-83 (1986) (plurality opinion)); *see also City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985) (Rehnquist, J., plurality) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker.").

Port Authority moves to dismiss on grounds that Plaintiffs have pled no facts establishing a "custom" or "policy," since the September 2013 GWB lane closures were a "one-time event." (PA Mov. Br. at 5-6.) Additionally, they argue that there are no facts establishing a "final policymaking authority," since under the relevant by-laws, Baroni and Wildstein do not have authority to set policy. (*Id.* at 6-8.)

Plaintiffs oppose the Port Authority's motion to dismiss on grounds that Wildstein and Baroni held positions that provided them with "final policymaking authority" at Port Authority. (Pl. Opp. Br. at 43–45; *see* SAC ¶ 315.) For example, Plaintiffs point to the allegations in the SAC that Baroni served as the Port Authority's Deputy Executive Director, where he was responsible for the general supervision of all aspects of the Port Authority's business, including the operations of Port Authority transportation facilities, and that Baroni hired Wildstein to serve as Director of Interstate Capital Projects for the Port Authority, and to operate as Baroni's chief-of-staff. (SAC ¶¶ 34–38.) More substantively, Plaintiffs argue that Wildstein's "ability to implement the lane reductions demonstrates his final decision making authority within the Port Authority," including allegations that Port Authority staff feared they would be terminated if they did not acquiesce to Wildstein's orders. (*See id.* ¶¶ 104–10.) Plaintiffs then contend that Baroni's alleged knowledge

17

and approval of the lane closures, coupled with the fact that he was Wildstein's supervisor, demonstrate Baroni's "final policymaking authority." (Pl. Opp. Br. at 44–45.)

The Court agrees with Plaintiffs. The question of whether Wildstein and Baroni had "final policymaking authority," and thus whether Port Authority adopted a "custom" or "policy" for purposes of *Monell* liability, is one of fact that is not amenable to resolution at this early stage.

In *Pembaur*, the Supreme Court emphasized that "municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." 475 U.S. at 483; *Prapotnik*, 485 U.S. at 123 ("[T]he challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in *that area* of the city's business.") (citing *Pempaur*, 475 U.S. at 482–83) (emphasis in original). Accordingly, it is this Court's "task" to "'identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue.'" *McMillian v. Monroe Cty., Ala.*, 520 U.S. 781, 784–85 (1997) (quoting *Jett v. Dallas Indep. School Dist.*, 491 U.S. 701, 737 (1989)). To make this determination, the Court must look to the relevant state laws. *Pembaur*, 475 U.S. at 483 ("Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority, and of course, whether an official had final policymaking authority is a question of state law."); *Praprotnik*, 485 U.S. at 124, 126 ("reiterating that the identification of policymaking officials is a question of state law" and noting that "a federal court would not be justified in assuming that municipal policymaking authority lies somewhere other than where the applicable law purports to put it").

18

Under the relevant state laws, Wildstein and Baroni do not possess final policymaking authority. Port Authority By-Laws[12] establish nine officers: Chairman, Vice-Chairman, Executive Director, Deputy Executive Director, General Counsel, Chief Financial Officer, Treasurer, Comptroller, and Secretary. (By-Laws, Art. II.) The By-Laws make clear that the Executive Director is vested with the relevant policymaking authority:

> In compliance with the policies established by the Board of Commissioners, the Executive Director shall have authority to adopt, rescind, amend, and modify rules and regulations
> - (i) for and in connection with facilities and properties owned, leased, or operated by the Port Authority and for the conduct of the users thereof and all other persons in or about such facilities or properties, including the officers, employees, or representatives of the Port Authority and of the users of its facilities and properties and people doing business with it or them; and
> - (ii) for the operation, management, and conduct of the business of the Port Authority and the staff.

(*Id.* Art. X, § (i).) In contrast, as Deputy Executive Director and Director of Interstate Capital Projects, respectively, Baroni and Wildstein were not explicitly vested with the relevant policy making authority under the By-Laws.

Nevertheless, the Court finds it inappropriate to definitively rule on this issue at this early stage because questions of fact remain as to whether the Executive Director, Patrick Foye, essentially delegated the relevant authority to Baroni and Wildstein. "[Courts] must keep in mind the Supreme Court's admonition to pay close attention to the facts of each case while conducting

---

[12] The Port Authority traces its roots to an agreement between the states of New York and New Jersey dating back to 1834, and on April 30, 1921, the states entered into a compact to formally create the Port Authority. *See N.J.S.A.* §§ 32:1–1, –3, –4. The Port Authority consists of twelve commissioners, six from each state. *Id.* § 32:1–5. The commissioners are empowered to adopt by-laws for the Port Authority's management. *Id.* § 32:1–6. The By-Laws of the Port Authority of New York and New Jersey, Corrected to Sept. 20, 2012 (hereinafter "By-Laws") are available at https://www.panynj.gov/corporate-information/pdf/by-laws-pa.pdf (last accessed Aug. 19, 2016).

the state action inquiry." *Groman v. Twp. of Manalapan*, 47 F.3d 628, 641 (3d Cir. 1995) (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939 (1982)).

Although the Supreme Court has cautioned that "a federal court would not be justified in assuming that municipal policymaking authority lies somewhere other than where the applicable law purports to put it," *Praprotnik*, 485 U.S. at 124, 126, it has also made clear that "[a]uthority to make municipal policy may be granted directly by a legislative enactment *or may be delegated by an official who possesses such authority* . . . ." *Pembaur*, 475 U.S. at 483 (emphasis added). Indeed, the SAC makes clear that Wildstein and Baroni had the power and authority to implement the lane reconfiguration without Foye's approval, despite the By-Laws indicating that such power was reserved for Foye. (*See generally* SAC ¶¶ 88–169.) This suggests that the authority to make Port Authority policy in this particular area was effectively delegated to Baroni and Wildstein.[13]

In sum, accepting all allegations as true and construing them in a light most favorable to them, Plaintiffs have sufficiently alleged that the lane and toll booth reductions were caused by an unconstitutional municipal policy, attributable to a municipal policymaker. *See Tuttle*, 471 U.S. at 823–24. Accordingly, the Court concludes at this nascent stage that Port Authority acted under color of state law. Port Authority, however, may revisit the issue in due course. *See Chirdon v. Borough of Plum*, 92 F. Supp. 3d 360, 365 (W.D. Pa. 2015) (noting, in ruling on summary judgment motion, that "[a]lthough the determination about whether an official is a final

---

[13] *See Testimony from Patrick Foye, Executive Director of the Port Authority of New York and New Jersey, and other individuals concerning the decision by the Port Authority of New York and New Jersey to reduce, without prior public notice, the number of access lanes to the George Washington Bridge in Fort Lee, New Jersey, from September 9, 2013 through September 13, 2013*, Hearing Before the New Jersey Assembly Transportation, Public Works and Independent Authorities Committee (Dec. 9, 2013) at 155, 165, 170 (noting that policies to prevent someone other than the Executive Director from unilaterally adjusting lane configurations were put in place only after the events in question). *Available at* http://www.njleg.state.nj.us/legislativepub/pubhear/atr12092013.pdf (last accessed Aug. 18, 2016).

policymaker is generally a question of law for the court, some courts have found allegations that a municipal entity, as a matter of custom, delegated final policymaking authority to an official may present issues of fact.") (citing *Kujawski v. Bd. of Comm'rs*, 183 F.3d 734, 739 (7th Cir. 1999)).

### d. Chris Christie for Governor (CCFG)

The SAC alleges that Chris Christie for Governor is responsible for the actions of Kelly, Drewniak, Wildstein, and Baroni because they allegedly "promoted, acted on behalf of and/or conspired with" CCFG. (SAC ¶ 310.) Plaintiffs allege that there was "significant cross-over" between personnel within the Legislative and Intergovernmental Affairs (IGA) branch of Governor Christie's office and CCFG staff. (*Id.* ¶¶ 50–55.) For example, the SAC specifically alleges that Kelly "participated in campaign business" on behalf of CCFG and that "political endorsement efforts" performed by IGA staff on behalf of CCFG "blend[ed] into the official work activities of IGA employees." (*Id.* (citations omitted); *see also id.* ¶¶ 56–87 (detailing efforts prior to the lane closures to secure the endorsement of Mayor Sokolich).)

In determining whether a private entity can be deemed a state actor for Section 1983 purposes, "[t]he principal question at stake is whether there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Kach v. Hose*, 589 F.3d 626, 646 (3d Cir. 2009) (quoting *Leshko v. Servis*, 423 F.3d 337, 339 (3d Cir. 2005)). To answer that question, the Third Circuit has outlined three broad tests: (1) "whether the private entity has exercised powers that are traditionally the exclusive prerogative of the state"; (2) "whether the private party has acted with the help of or in concert with state officials"; and (3) whether "the [s]tate has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity."

21

*Id.* (quoting *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1142 (3d Cir. 1995)).[14] "Under any test, '[t]he inquiry is fact-specific.'" *Id.* (quoting *Groman*, 47 F.3d at 638); *see also Crissman v. Dover Downs Entm't Inc.*, 289 F.3d 231, 234 (3d Cir. 2002) (en banc) (noting that "the facts are crucial").

CCFG moves to dismiss on grounds that Plaintiffs do not sufficiently allege joint action between any state actor and CCFG to hold CCFG liable. (CCFG Mov. Br. at 5–9.) CCFG argues that allegations of potential "overlap" between volunteers of CCFG and employees of the State are not enough, especially where there are no allegations that any individual committed unlawful acts while specifically volunteering for CCFG. (*Id.*) Plaintiffs oppose the motion on grounds that the SAC contains sufficient allegations showing that the individual Defendants acted on behalf of CCFG and also that CCFG was intertwined with the State. (Pl. Opp. Br. at 26–27, 45.)

At this stage, construing the SAC in a light most favorable to Plaintiffs, the Court finds that the SAC sufficiently alleges that State employees acted on behalf of CCFG and that the IGA and CCFG were entwined, such that CCFG may be deemed a state actor. (*See* SAC ¶¶ 50–87.) Furthermore, the Court is mindful that determining whether a private entity can be considered a state actor is a fact-intensive inquiry. *See Crissman*, 289 F.3d at 234. Discovery is needed to aid the Court in determining the true nature of the relationship between the State and CCFG. To be clear, the Court has no opinion on whether Plaintiff "will ultimately prevail" on his claims, but simply finds that the SAC sufficiently shows a plausible claim to relief such that Plaintiff is

---

[14] Liability may also attach where the private entity "conspired with a state actor." *Opoku v. Educ. Comm'n for Foreign Med. Graduates*, 574 F. App'x 197, 201 (3d Cir. 2014) (citing *Dennis v. Sparks*, 449 U.S. 24, 27-28 (1980)). "To allege such a conspiracy, the complaint must specifically present facts tending to show agreement and concerted action to deprive the plaintiff of his or her rights. The bare allegation of an agreement is insufficient." *Coulter v. Allegheny Cty. Bar Ass'n*, 496 F. App'x 167, 169 (3d Cir. 2012) (citing *Abbott v. Latshaw*, 164 F.3d 141, 148 (3d Cir. 1998) (finding Section 1983 claim in complaint contained sufficient allegations of concerted action to withstand motion to dismiss)).

"entitled to offer evidence to support the claims." *United States ex rel. Wilkins*, 659 F.3d at 302. CCFG may revisit the argument in due course.

2. The SAC Sufficiently Alleges Violation of a Right Secured by the Constitution and Laws of the United States

   a. *Right to Interstate and Intrastate Travel on Public Roadways Free From Restrictions Unrelated to Legitimate Government Objectives*[15]

In this section, the Court finds that Plaintiffs have sufficiently demonstrated rights related to both interstate and intrastate travel. The Court discusses each right in turn.

### i. Interstate Travel

The federal guarantee of interstate travel has been consistently recognized by the United States Supreme Court and is "firmly embedded" in its jurisprudence. *See Saenz v. Roe*, 526 U.S. 489, 498 (1999) (citing *United States v. Guest*, 383 U.S. 745, 757 (1966)); *see also Shapiro v. Thompson*, 394 U.S. 618, 643 (1969) (noting that it "is a right broadly assertable against private interference as well as governmental action" and "is a virtually unconditional personal right, guaranteed by the Constitution to us all") (Stewart, J., concurring); *United States v. Guest*, 383 U.S. 745, 757 (1966) ("The constitutional right to travel from one State to another, and necessarily to use the highways and other instrumentalities of interstate commerce in doing so, occupies a position fundamental to the concept of our Federal Union.").

---

[15] As an initial matter, the Court notes that Wildstein pled guilty to "conspiracy against civil rights" under 18 U.S.C. § 241, in that he "knowingly and willfully conspired and agreed with others, including Baroni and Kelly, to injure and oppress the residents of Fort Lee in the free exercise and enjoyment of the rights and privileges secured to them by the Constitution and laws of the United States, *namely, the right to localized travel on public roadways free from restrictions unrelated to legitimate government objectives.*" (Criminal No. 15-209-SDW, ECF No. 1 at 28) (emphasis added). The Baroni and Kelly indictment charges the same violation. (Criminal No. 15-193-SDW, ECF No. 1 at 33.) Judge Wigenton denied Baroni and Kelly's motions to dismiss these counts. (*See* Criminal No. 15-193-SDW, ECF No. 126 at 16–19 (D.N.J. June 13, 2016).)

23

As relevant to this case, the right to travel "protects the right of a citizen of one State to enter and to leave another State." *Saenz*, 526 U.S. at 500. More specifically, it "protect[s] persons against the erection of actual barriers to interstate movement." *Zobel v. Williams*, 457 U.S. 55, 60 n.6 (1982).

Here, construing the SAC in a light most favorable to Plaintiffs, they have sufficiently alleged a violation of the right to interstate travel. The GWB is the "busiest bridge in the world" and "provides New Jersey residents access to Manhattan[.]" (SAC ¶ 292.) Plaintiffs allege that by reducing the number of access lanes and toll booths from the Fort Lee approach from three to one, Defendants created massive traffic problems in Fort Lee, and erected an actual barrier to interstate movement for Plaintiffs attempting to use the GWB to cross from New Jersey into Manhattan on the dates in question. (*See id.* ¶¶ 80–87; 292–300.) When giving all inferences to Plaintiffs, although motorists were in theory permitted to utilize the GWB for purposes of interstate travel on the dates in question, the gridlock created by Defendants was sufficient to effectively deny motorists this right. *Cf. Dunn v. Blumstein*, 405 U.S. 330, 340 (1972) (noting that right to travel cases have not always "relied on the presence of actual deterrence").

### ii. Intrastate / Localized Travel

Although the Supreme Court has not yet recognized a constitutional right to localized travel,[16] the Third Circuit unambiguously recognized such a right in 1990. In *Lutz v. City of York, Pa.*, the Circuit was called upon to determine the constitutionality of a municipal "anti-cruising" ordinance, which restricted travel in the streets of York, Pennsylvania, by outlawing "unnecessary,

---

[16] The Supreme Court has thus far only recognized a constitutional right to interstate travel. *See, e.g., Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 274–78 (1993) (differentiating between interstate and intrastate travel where plaintiffs alleged violation only of right to interstate travel); *see also Memorial Hospital v. Maricopa County*, 415 U.S. 250, 255–56 (1974) (whether "to draw a constitutional distinction between interstate and intrastate travel [is] a question we do not now consider").

repetitive driving" on two major downtown thoroughfares between the hours of 7:00 pm and 3:00

am, on grounds that cruising traffic prevented emergency vehicles from timely responding to calls.

899 F.2d 255, 257, 270 (3d Cir. 1990).  In a unanimous opinion authored by Judge Becker, the

Circuit concluded that the anti-cruising ordinance, under even the "narrowest conception" of

substantive due process, implicated a fundamental, substantive due process right. *Id.* at 267–68.

> The right or tradition we consider may be described as the right to
> travel locally through public spaces and roadways.  Under York's
> view, a state or local government could constitutionally prohibit all
> freedom of movement that does not involve interstate migration,
> interstate commerce, business between a citizen and the federal
> government, and (presumably) travel incident to otherwise protected
> activity.  Conceivably this result could be made less implausible by
> attempting to distinguish a more particularized, protected tradition
> of travel or wandering on foot . . . from an unprotected tradition of
> localized travel by automobile.  But accepting that distinction would
> imply the constitutionality of the limited travel ban described above,
> enforced exclusively by state control of the public roadways.  It
> would permit, for example, the prohibition of simply "going for a
> ride" through one's neighborhood, so long as the prohibition could
> be effected without burdening the protected forms of travel and
> justified by any legitimate state purpose it conceivably furthered—
> for example, conserving gasoline—so as to survive the forgiving
> requirements of rational basis review.
>
> We conclude that the right to move freely about one's neighborhood
> or town, even by automobile, is indeed "implicit in the concept of
> ordered liberty" and "deeply rooted in the Nation's history."
> Despite our preceding analysis, this bottom-line judgment is
> unquestionably ad hoc, to some extent . . . [but] it is a judgment we
> are required to make.

*Id.* at 268.  The Circuit ultimately concluded that the ordinance was valid, in that it was "narrowly

tailored to meet significant city objectives."  *Id.* at 269–70.[17]

---

[17] Both the Second and Sixth Circuits have identified a similar right.  For example, in *King v. New Rochelle Municipal Housing Authority*, the Second Circuit, in striking down a durational residency requirement related to public housing, reasoned that it would be "meaningless to describe the right to travel between states as a fundamental precept of

25

The right identified in *Lutz* was recently analyzed in *Lanin v. Borough of Tenafly*, No. 12-2725 (KM), 2014 WL 31350, at \*9 (D.N.J. Jan. 2, 2014) (noting that *Lutz* "exhaustively discussed" the right to intrastate travel and its possible sources). At issue in *Lanin* were local ordinances designed to address traffic flow around a public school and related safety concerns. *Id.* Plaintiffs alleged that the ordinances violated their right to intrastate travel because they necessitated a more roundabout route and to "remain in their home and delay their departure" to avoid school traffic. *Id.* The district court held that the ordinances did not amount to a deprivation of the right to intrastate travel:

> [Plaintiffs] do not allege a single instance of actually being prevented from entering or leaving their home or neighborhood. Nor is anyone attempting to prohibit or prevent them from traveling. Traffic, even if it can be attributed to poor public planning, is not a deprivation of a fundamental right. Nor does it violate any fundamental right to require that auto traffic, at certain times of day, take a route that turns out to be more circuitous when viewed from the perspective of a particular property owner's driveway.

*Id.*

Although Defendants seize upon this passage in support of their arguments, the Court does not find it particularly persuasive because *Lanin* is clearly distinguishable from the facts in this case. For example, *Lanin* involved ordinances passed after publication in a newspaper, designed to alleviate traffic around a public school—*i.e.*, a significant city objective. In contrast, as detailed

---

personal liberty and not to acknowledge a correlative constitutional right to travel within a state." 442 F.2d 646, 648 (2d Cir. 1971); *see also Ramos v. Town of Vernon*, 353 F.3d 171, 172 (2d Cir. 2003) (holding that "right to free movement is a vital component of life in an open society" in assessing ordinance that established curfew for minors). Similarly, the Sixth Circuit, in addressing a "drug exclusion zone" that prevented persons from entering an area of a city at a particular time, cited *Lutz* and held that "the right to travel locally through public spaces and roadways enjoys a unique and protected place in our national heritage." *Johnson v. City of Cincinnati*, 310 F.3d 484, 498 (6th Cir. 2002). "In addition to its solid historical foundation, the tremendous practical significance of a right to localized travel also strongly suggests that such a right is secured by substantive due process. The right to travel locally through public spaces and roadways—perhaps more than any other right secured by substantive due process—is an everyday right, a right we depend on to carry out our daily life activities. It is, at its core, a right of function." *Id.*

below, the allegations in this case speak to a vindictive plot, devoid of any significant government objective, to proactively prohibit and prevent the residents of Fort Lee from freely traveling. Whereas *Lanin* addressed an instance of "poor public planning," the facts of this case speak to something far more sinister. Accordingly, the Court does not find *Lanin* to be persuasive

In sum, this Court agrees with Judge Wigenton that *Lutz* established a right to localized travel within a state, but that right may be curtailed by a significant government interest narrowly tailored to achieve that goal.[18]

In moving to dismiss the SAC, Port Authority, Baroni, Drewniak, and CCFG each argue that the allegations fail to state a claim for violation of a right to interstate or intrastate travel. In essence, Defendants argue that the allegations only show that Plaintiffs were delayed in their chosen route of travel on the dates in question, and that they were not prohibited from traveling. (*See* PA Mov. Br. at 8–11, CCFG Mov. Br. at 7–8, NJ&MD Mov. Br. at 20–23, Baroni Mov. Br. at 11–13.) Plaintiffs oppose on grounds that they have sufficiently alleged that the massive gridlock they were forced to sit in, for no legitimate governmental purpose, violated their rights to localized travel. (Pl. Opp. Br. at 28–36.)

The Court agrees with Plaintiffs that the SAC sufficiently alleges violation of a right to localized travel on public roadways free from restrictions unrelated to legitimate government

---

[18] To the extent that Plaintiffs seek to assert an independent Section 1983 cause of action premised on violation of substantive due process (*see* SAC ¶ 302; Pl. Opp. Br. at 36–39), the Court finds it to be subsumed within the right identified in *Lutz*. The Court agrees that the facts as alleged, when construed in a light most favorable to Plaintiffs, sufficiently demonstrate conduct that is "so egregious, so outrageous that it may fairly be said to shock the contemporary conscience" as to potentially state a claim for a substantive due process violation. *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998). However, the right identified by *Lutz* was premised on a substantive due process analysis. *See Lutz*, 899 F.2d at 267–68. Thus, Plaintiffs' independent Section 1983 cause of action premised on generalized "substantive due process violations" is redundant of the right identified in *Lutz*. However, the Court reserves the right to revisit any independent substantive due process claim should it later be determined on appeal that the SAC fails to state a violation of a right to localized travel under *Lutz*.

objectives. As detailed in the SAC, Defendants conspired to reduce the number of Fort Lee's access lanes and toll booths to the GWB in order to impose punishment against Mayor Sokolich and "to deprive plaintiffs and the plaintiff class members of their federal and state constitutional rights as well as their civil rights." (SAC ¶ 292.) Defendants intentionally planned for the lane closures and toll booth reductions to occur without warning, during morning rush hour on the first days of school, in order to maximize the punitive impact. (*Id.* ¶¶ 293, 296.) Upon implementing the plan, Defendants caused "major traffic congestion for all motorists who attempted to enter the GWB through the Fort Lee access lanes as well as on Fort Lee's local roads," thus, effectively preventing "local travel and interstate movement across the bridge for plaintiffs and the plaintiff class members." (*Id.* ¶¶ 294-95.) Plaintiffs allege damages "including but not limited to loss of time, gas, and wages that cannot be reclaimed, other economic losses such as payment of tolls under false pretenses, to be falsely imprisoned and/or restrained in their vehicles, and to suffer emotional damages." (*Id.* ¶ 308). Accordingly, the Court finds that Plaintiffs have sufficiently alleged violation of a constitutional right to localized travel, as well as interstate travel.

### b. Equal Protection

In originally dismissing the CAC, the Court noted that "Plaintiffs' Equal Protection claim fails as Plaintiffs have failed to allege any facts whatsoever which would demonstrate that Plaintiffs were subjected to different treatment than those similarly situated." (6/29/15 Op. at 8–9.)

The Fourteenth Amendment's Equal Protection Clause provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "To prevail on an equal protection claim, a plaintiff must present evidence that s/he has been treated differently from persons who are similarly situated." *Williams v. Morton*, 343 F.3d 212,

28

221 (3d Cir. 2003); *see also Lande v. City of Bethlehem*, 457 F. App'x 188, 192 (3d Cir. 2012) ("To state a claim under the Equal Protection Clause, a § 1983 plaintiff must allege that a state actor intentionally discriminated against him because of his membership in a protected class.") (citing *Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 196 (3d Cir. 2009)).

If the plaintiff is not a member of a protected class—which is generally based on an immutable characteristic[19]—the claim must be premised on a "class-of-one" theory. *Lande*, 457 F. App'x 188, 192 (3d Cir. 2012) (citing *Engquist*, 553 U.S. at 601). To state a claim for "class of one" equal protection, at the very least, a plaintiff must allege that "(1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment." *Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006); *see also Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) ("Our cases have recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.").

"Persons are 'similarly situated' for purposes of an equal protection claim when 'they are alike in *all* relevant aspects.'" *Castaneira v. Potteiger*, 621 F. App'x 116, 121 (3d Cir. 2015) (quoting *Startzell v. City of Phila.*, 533 F.3d 183, 203 (3d Cir. 2008)) (emphasis in original). "In our Circuit, a plaintiff need not show that comparators are identical in all relevant aspects but rather that they share pertinent similarities." *Tucker Indus. Liquid Coatings, Inc. v. Borough of E.*

---

[19] "Classically, but not exclusively, such a protected class may be a racial, ethnic or religious minority." *Lanin*, 2014 WL 31350, at \*7; *see also Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 601 (2008) (emphasizing "discrete and identifiable classes" in connection with traditional equal protection claims).

allege that they were targeted by Defendants based on "geographic location and apparent political affiliation" and that they were subjected to different treatment than those similarly situated who did not have to face such extreme delays and congestion. (SAC ¶ 303.) Giving all inferences to Plaintiffs, the Court construes the SAC to allege "similarly situated" individuals as Plaintiffs suggest: "motorists who accessed the GWB via any other roadway/entrance and/or who entered New York from other [sic] the Lincoln and Holland Tunnels." (*See* Opp. Br. at 41.) Although this is admittedly an unusual "similarly situated" allegation on which to sustain an equal protection claim, the facts of this case are indeed highly unusual. Furthermore, Plaintiffs have sufficiently alleged that the purported discrimination was "purposeful" in that the lane closures and resulting traffic were clearly intended and created on purpose. (*See, e.g.*, SAC ¶ 112.)[20] Given the fact-intensive nature of such a claim, the Court concludes that discovery is needed to ultimately rule on the issue, and will revisit the claim in due course.

### 3. Defendants Baroni and Drewniak are Not Entitled to Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see also Montanez v. Thompson*, 603 F.3d 243, 249–50 (3d Cir. 2010) (quoting same). To determine whether a defendant is entitled to qualified immunity, the Court "must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right" and also "whether the right at issue was clearly established at the time of a defendant's alleged misconduct." *Pearson*, 555 U.S. at 232

---

[20] Even though the alleged impetus for the lane closures was political retribution for Mayor Sokolich, Plaintiffs have sufficiently alleged that Defendants intended for the lane closures to affect individuals other than Mayor Sokolich.

(citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)) (internal citations and quotations omitted). The Court should endeavor to resolve questions of qualified immunity "at the earliest possible stage in litigation." *Id.* (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)).

Baroni and Drewniak argue that they are entitled to qualified immunity because Plaintiffs have not sufficiently pleaded deprivation of a constitutional right, nor could they show that any such right was "clearly established." (NJ&MD Mov. Br. at 19–20, Baroni Mov. Br. at 10–11.) Plaintiffs oppose and contend that the SAC sufficiently alleges violation of a constitutional right that was clearly established, such that a reasonable official would have understood that his actions were violating the right. (Pl. Opp. Br. at 46–47.)

The Court agrees with Plaintiffs. As detailed in Part A.2, *supra*, Plaintiffs have stated a claim for violation of a constitutional right. Furthermore, the Court finds that the right was clearly established. In terms of determining whether a right is clearly established,

> it is not necessary that there have been a previous precedent directly in [sic] point. . . . The ultimate issue is whether, despite the absence of a case applying established principles to the same facts, reasonable officials in the defendants' position at the relevant time could have believed, in light of what was in the decided case law, that their conduct would be lawful.

*Good v. Dauphin Cnty. Soc. Servs. for Children & Youth*, 891 F.2d 1087, 1092 (3d Cir. 1989) (internal citations and quotations omitted). Indeed, the Supreme Court has made clear that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (citing *United States v. Lanier*, 520 U.S. 259 (1997)); *see also L.R. v. School Dist. of Phila. et al.*, No. 14-4640, --- F.3d ---, 2016 WL 4608133, at *9 (3d Cir. Sept. 6, 2016) (framing the inquiry as whether there are "sufficiently

analogous cases that should have placed a reasonable official in [defendant's] position on notice that his actions were unlawful")

Here, given that the Supreme Court has consistently and repeatedly recognized a right to interstate travel, *see Saenz*, 526 U.S. at 498, and the Third Circuit established a right to localized travel within a state subject to a significant government interest narrowly tailored to achieve that goal over two decades prior to the actions alleged in the SAC, *Lutz*, 899 F.2d at 268, the Court finds that the rights were clearly established. *Lutz* in particular is a sufficiently analogous case that should have placed a reasonable official in Baroni and Drewniak's position on notice that their actions were unlawful. Stated differently, when construing the allegations in a light most favorable to Plaintiffs, the Court cannot agree with Baroni and Drewniak that any reasonable official would have viewed their conduct to be lawful when undertaken. Accordingly, Count One shall proceed as to them.

## B. Counts Four and Five – Violation of New Jersey Civil Rights Act, N.J.S.A. § 10:6-1 *et seq.* (Count Four) and "Governmental Responsibility" Under the New Jersey Civil Rights Act, N.J.S.A. § 10:6-1, *et seq.*

In addition to bringing claims pursuant to Section 1983, Plaintiffs also bring a claim under the New Jersey State Constitution through the New Jersey Civil Rights Act ("NJCRA"), N.J.S.A. § 10:6-1, *et seq.* A person may bring a civil action under the NJCRA in two circumstances: "(1) when he's deprived of a right, or (2) when his rights are interfered with by threats, intimidation, coercion or force." *Felicioni v. Admin. Office of Courts*, 404 N.J. Super. 382, 400 (App. Div. 2008).

The NJCRA was modeled after Section 1983, and thus courts in New Jersey have generally looked at claims under the NJCRA "through the lens of § 1983." *Trafton v. City of Woodbury*,

799 F.Supp.2d 417, 443–44 (D.N.J. 2011); *see also Chapman v. New Jersey*, No. 08–4130, 2009 WL 2634888, *3 (D.N.J. Aug.25, 2009) ("Courts have repeatedly construed the NJCRA in terms nearly identical to its federal counterpart . . . ."); *Armstrong v. Sherman*, No. 09–716, 2010 WL 2483911, *5 (D.N.J. June 4, 2010) ("[T]he New Jersey Civil Rights Act is a kind of analog to section 1983 . . . ."); *see generally Hedges v. Musco*, 204 F.3d 109, 120 n.12 (3d Cir. 2000) (concluding that New Jersey's constitutional provisions concerning search and seizures are interpreted analogously to the Fourth Amendment); *Pitman v. Ottehberg,* No. 10-2538, 2013 WL 6909905, *8 (D.N.J. Dec. 31, 2013) (collecting cases)..

Count Four alleges violation of the NJCRA against Kelly, in her individual and/or official capacity, Drewniak, in his individual and/or official capacity, Wildstein, Baroni, Port Authority, CCFG, and New Jersey. (SAC ¶¶ 374–94.) Count Five is alleged against New Jersey and Port Authority on grounds that the actions of the Individual Defendants can be attributed as policy, and also based on an alleged failure to train. (*Id.* ¶¶ 395–408.)

There is no dispute that Plaintiffs' NJCRA claim and Section 1983 claims are based on the same underlying facts and theories. Having concluded that the SAC sufficiently states a Section 1983 claim against the Individual Defendants in their individual capacities, CCFG, and Port Authority, Counts Four and Five shall also proceed against these same Defendants for the reasons discussed in Part A, and to the same extent (*i.e.*, the NJCRA claims shall proceed as to Port Authority to the extent they are premised on Wildstein and Baroni's possession of "final policymaking authority" only, but shall be dismissed *with prejudice* to the extent it is premised on a failure to train).

The naming of New Jersey as a Defendant under Counts Four and Five is the primary difference between Plaintiffs' NJCRA claims and their Section 1983 claims. New Jersey argues

34

that the State is not a "person" under the NJCRA and therefore not subject to suit under the statute. *(See* NJ&MD Mov. Br. at 25–28.) Despite Plaintiffs' arguments to the contrary *(see* Pl. Opp. Br. at 51–60), the Court agrees with New Jersey. *See Brown v. State*, 442 N.J. Super. 406, 426 (App. Div. 2015) (finding that the State is not a "person" under the NJCRA); *see Didiano v. Balicki*, 488 F. App'x 634, 638-39 (3d Cir. 2012) (holding that the State is not a "person" under the NJCRA because although the NJCRA does not define "person," the definition of "person" in N.J.S.A. § 1:1–2 "explicitly states that the word 'person' shall include the State of New Jersey only in the limited circumstance of certain property disputes . . . . Thus, New Jersey has provided its own definition of the word 'person,' and that definition does not include the State . . . ."). Thus, Counts Four and Five of the SAC shall be dismissed as to New Jersey *with prejudice.*

## C. Count Six – Common Law Civil Conspiracy

A civil conspiracy in New Jersey is defined as "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." *Banco Popular N. Am. v. Gandi*, 876 A.2d 253, 263 (N.J. 2005). To state a cause of action, a plaintiff must allege four elements: "(1) a combination of two or more persons; (2) a real agreement or confederation with a common design; (3) the existence of an unlawful purpose, or of a lawful purpose to be achieved by unlawful means; and (4) proof of special damages." *Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 414 (3d Cir. 2003) (citing *Naylor v. Harkins*, 99 A.2d 849, 855 (N.J. Super. Ct. Ch. Div. 1953), *modified on other grounds*, 109 A.2d 19 (N.J. Super. Ct. App. Div. 1954)).

The Court previously dismissed this claim on grounds that the CAC was "devoid of any particularized facts which describe the purported agreements between Defendants, the location and

35

time that the agreement was planned, the nature and extent of the unlawful purpose which formed the basis of the conspiracy, or the means by which the alleged scheme was achieved." (6/29/15 Op. at 16.) The Court granted Plaintiffs leave to amend to set forth the "who, what, when, where, and how of the conspiracy." (*Id.*)

According to the SAC, Defendants Kelly, Baroni, Wildstein, and Drewniak "acted in concert" to unlawfully reduce the number of Fort Lee's access lanes and toll booths to the George Washington Bridge from three to one in order to cause major traffic problems in Fort Lee to the detriment of Plaintiffs, as retribution for Mayor Sokolich's decision not to endorse Governor Christie's re-election bid. (SAC ¶¶ 410–12.) Plaintiffs further allege that, in an effort "maximize the impact of the lane reductions" on Plaintiffs, Kelly, Baroni, Wildstein, and Drewniak agreed to implement the lane and toll both reductions on the first day of school in Fort Lee, without advance warning, and to maintain "radio silence" with respect to any and all inquiries from Mayor Sokolich and other Fort Lee officials regarding the closures. (*Id.* ¶ 413.) In addition, Kelly, Baroni, Wildstein, and Drewniak agreed to use the cover story of a traffic study. (*Id.* ¶ 414.) In accordance with the plan, "Wildstein, with the knowledge and approval of defendants Kelly, Baroni, and Drewniak" caused the GWB maintenance staff to implement and maintain the lane closures from September 9, 2013, through September 13, 2013, which deprived Plaintiffs "of their protected rights to interstate and intrastate travel, substantive due process, equal protection and privileges and immunities under the law, and forced them to be falsely imprisoned and falsely restrained in their vehicles against their will and without their consent." (*Id.* ¶¶ 415–17.) Furthermore, Plaintiffs allege that Baroni, Kelly, Wildstein, and Drewniak "performed and/or approved the issuance [of] false and misleading media statements asserting that the closures were a traffic study to conceal their true purposes and unlawful actions." (*Id.* ¶¶ 418–21.) Plaintiffs allege that New

36

Jersey, CCFG, and Port Authority "are responsible for the individual defendants' actions and misconduct under the doctrine of *respondeat superior* as previously alleged." (*Id.* ¶ 424.)

1. Defendants Wildstein, Baroni, Drewniak, and Kelly

The Court finds that the SAC sufficiently states a cause of action for civil conspiracy against the Individual Defendants. Plaintiffs adequately allege an agreement between these Defendants to unlawfully restrict Plaintiffs in the exercise of their rights, and resulting damages. *See Morganroth*, 331 F.3d at 414. In short, Plaintiffs complied with the directives provided in this Court's previous opinion, and have set forth the "who, what, when, where, and how" of the conspiracy.

The Court notes again that Kelly does not move to dismiss the SAC, while Wildstein does not intend to take any legal or factual position in this matter that contradicts the terms of his plea agreement (in which he pled guilty to "conspiracy against civil rights") (Wildstein Mov. Br. at 4–5). And despite Drewniak's arguments to the contrary (*see* n.10, *supra*), the Court finds that when construing the allegations in the SAC in a light most favorable to them, Plaintiffs have demonstrated a plausible claim to relief against Drewniak for common law civil conspiracy—*i.e.*, there is a reasonable basis to infer Drewniak's liability based on the pleadings.

Likewise, the Court rejects Baroni's arguments that Plaintiffs have failed to establish an underlying claim or plead special damages. (Baroni Mov. Br. at 27–28.) Plaintiffs have sufficiently alleged an underlying cause of action to support a common law civil conspiracy claim. (*See, e.g.*, Part A.) Plaintiffs have also specifically pleaded special damages in accordance with Rule 9(g): allegations of damages such as "including but not limited to loss of time, gas, and wages that cannot be reclaimed, other economic losses such as payment of tolls under false pretenses, to be falsely imprisoned and/or restrained in their vehicles, and to suffer emotional damages" are

sufficient to put Defendants on notice of any potential special damages. (SAC ¶ 308; ¶ 409 (incorporating ¶ 308 into the common law civil conspiracy claim).) *See Delzotti v. Morris*, No. 14-7223-JBS, 2015 WL 5306215, at \*8 (D.N.J. Sept. 10, 2015) ("The purpose underlying Rule 9(g) is to give notice to the other side of those special damages claimed.") (citation and quotation marks omitted). *Cf. John Wiley & Sons, Inc. v. Rivadeneyra*, --- F.Supp.3d ---, No. 13-1085, 2016 WL 1407744 (D.N.J. Apr. 11, 2016) (concluding that generalized allegations of "lost profits" sufficiently satisfied "special damages" element at motion to dismiss stage).

## 2. Defendants Port Authority, CCFG, and New Jersey

The SAC alleges that Port Authority, CCFG, and New Jersey are responsible for the common law civil conspiracy under a *respondeat superior* theory of liability. (SAC ¶ 424.)

### a. *It is premature to determine whether the individual Defendants were acting in the scope of their employment.*

Port Authority moves to dismiss on grounds that it is implausible that Baroni and Wildstein's actions were in the scope of their employment, as needed to establish *respondeat superior* liability. (PA Mov. Br. at 20–22.)[21] For the same reasons elaborated in Part A.1.c, *supra*, such a position is too fact-intensive to determine at this nascent stage of the litigation, but the Court shall provide leave to revisit this argument in due course. *DiMaria Const., Inc. v. Interarch*, 351 N.J. Super. 558, 569–73 (App. Div. 2001), *aff'd*, 172 N.J. 182 (2002) (indicating that whether employees' actions were in the scope of employment and motivated to serve employer was a

---

[21] To avoid redundancy, the Court simply notes that, like Baroni, CCFG argues that Plaintiffs have failed to establish an underlying wrong to support a civil conspiracy claim (CCFG Mov. Br. at 16–17) and Port Authority argues that Plaintiffs have failed to sufficiently plead special damages (PA Mov. Br. at 21–22). As explained in Part C.1, *supra*, the Court disagrees with these arguments.

question of fact for the jury). Accordingly, the Court finds that the SAC sufficiently states a cause of action for common law civil conspiracy as to Port Authority and CCFG.

     *b. The Notice of Claim provided to New Jersey pursuant to the New Jersey Tort Claims*
           *Act sufficiently complied with the purpose of the statute under the facts of this case.*

New Jersey moves to dismiss on grounds that the Notice of Claim filed on behalf of "any and all Plaintiffs who have yet to be identified and fit within the potential representative class" is insufficient as a matter of law under the New Jersey Tort Claims Act, N.J.S.A. § 59:1–1, *et seq.* ("NJTCA"). (NJ&MD Mov. Br. at 34–38.) Relative to the Court's analysis, New Jersey argues that Count Six should be dismissed as to the unidentified parties and putative class.[22] In opposition, Plaintiffs argue that the claim should proceed, because the notice on behalf of the unidentified class members complies with the NJTCA's facial requirements and sufficiently comports with the goals underlying the NJTCA. (Pl. Opp. Br. at 71–76.)

The NJTCA provides that "[n]o action shall be brought against a public entity or public employee under [the NJTCA] unless the claim upon which it is based shall have been presented in accordance with the procedure set forth in this chapter." N.J.S.A. § 59:8–3. "A claim shall be presented by the claimant or by a person acting on his behalf and shall include" the requirements listed in Section 59:8–4. *Id.* § 59:8–4. Additionally, "[t]he claim shall be signed by the claimant or by some person on his behalf." *Id.* § 59:8–5. "A claim for damage or injury arising under this act against the State shall be filed either with (1) the Attorney General or (2) the department or agency involved in the alleged wrongful act or omission" *id.* § 59:8–7, and "shall be

---

[22] To be clear, New Jersey argues that Counts Six, Nine, and Ten should be dismissed as to the unidentified parties and putative class, with respect to both New Jersey and Drewniak. Because the Court determines that Counts Nine and Ten must be dismissed for other reasons, it does not address the NJTCA argument in connection with those claims.

presented . . . not later than the 90th day after accrual of the cause of action. After the expiration of six months from the date notice of claim is received, the claimant may file suit in an appropriate court of law." *Id.* § 59:8-8.

Here, there is no dispute that the Notice of Claim filed on April 7, 2014, by the Law Offices of Rosemarie Arnold complies with the directives of N.J.S.A. § 59:8–1 *et seq.* for the plaintiffs named therein. *(See* ECF No. 171-3.) The dispute is whether filing a Notice of Claim on behalf of "any and all Plaintiffs who have yet to be identified and fit within the potential representative class" is legally sufficient to support tort claims against New Jersey for the Plaintiffs named in the SAC as well as potential future class members.[23] This appears to be an issue of first impression, as the parties did not provide, and the Court could not locate, any binding case law directly on point.[24]

The NJTCA was enacted in 1972 with an "overall purpose . . . to reestablish the immunity of public entities while coherently ameliorating the harsh results of the doctrine." *Beauchamp v. Amedio*, 164 N.J. 111, 115 (2000) (citing N.J.S.A. § 59:1–2). The goals underlying the NJTCA are:

> (1) "to allow the public entity at least six months for administrative review with the opportunity to settle meritorious claims prior to the bringing of suit"; (2) "to provide the public entity with prompt notification of a claim in order to adequately investigate the facts and prepare a defense [,]"; (3) "to afford the public entity a chance

---

[23] The April 7, 2014 Notice of Claim identified the Galicki Plaintiffs only. (ECF No. 171-3.) The Epstein Law Firm does not contend that a Notice of Claim was timely filed on behalf of the GW Plaintiffs. Accordingly, since the Galicki Plaintiffs are not named as parties in the SAC, whether Plaintiffs here can assert tort claims *(i.e.*, Counts Six, Nine, and Ten) against New Jersey and Drewniak turns on whether it is legally sufficient to file a Notice of Claim on behalf of "any and all Plaintiffs who have yet to be identified and fit within the potential representative class."

[24] Although in *S.E.W. Friel Co. v. New Jersey Turnpike Authority*, the New Jersey Supreme Court interpreted the "on behalf of" requirement for purposes of a late-filed Notice of Claim to include a "tenuous" relationship, it specifically made clear that the holding "should not be interpreted as furnishing encouragement to the filing of late notices of claim by complete strangers to the claimant. It is not to be taken as indicative of any tolerance of 'claim generating' or 'claim production.' Neither of these elements appears in any degree in the case before us." 73 N.J. 107, 122 (1977). Thus, *Friel* provides little guidance to the Court.

40

> to correct the conditions or practices which gave rise to the claim"; and (4) to inform the State "in advance as to the indebtedness or liability that it may be expected to meet."

*Id.* at 121–22 (internal citations omitted) (alteration and quotation marks in original). Courts interpreting the NJTCA "often look to interpretations of the California Tort Claims Act (Cal. Gov't Code § 820.2) and the United States Tort Claims Act (28 U.S.C.A. § 2680(a)) for guidance in construction of [the NJTCA]." *Birchwood Lakes Colony Club, Inc. v. Borough of Medford Lakes*, 90 N.J. 582, 595 (1982) (citations omitted).

California's Tort Claims Act has been interpreted to permit a Notice of Claim filed on behalf of a class. In *City of San Jose v. Superior Court*, 12 Cal. 3d 447 (1974), the Supreme Court of California interpreted the presentation requirements of California's Tort Claims Act, which are essentially identical to New Jersey's. *Compare* Cal. Gov't Code § 910, *with* N.J.S.A. § 59:8–4. The California Supreme Court concluded that, in a class action, "claimant" in Section 910 refers to the class itself rather than to each individual class member. *San Jose*, 12 Cal. 3d at 457. The *San Jose* court explicitly "reject[ed] the suggested necessity for filing an individual claim for each member of the purported class. To require such detailed information in advance of the complaint would severely restrict the maintenance of appropriate class actions—contrary to recognized policy favoring them." *Id.* The *San Jose* court ultimately held that in order to satisfy the presentation requirements of the California Tort Claims Act, "the class claim must provide the name, address, and other specified information concerning the *representative* plaintiff and then sufficient information to identify and make ascertainable the class itself." *Id.* (emphasis in original). This information "reasonably enable[s] the public entity to make an adequate investigation of the merits of the claim and to settle it without the expense of a lawsuit[.]" *Id.* at 456.

41

On the other hand, the Federal Tort Claims Act ("FTCA") has been strictly interpreted to require the filing of administrative claims by all individual putative class members. *See Com. of Pennsylvania, by Sheppard v. Nat'l Ass'n of Flood Insurers*, 520 F.2d 11, 23 (3d Cir. 1975) (holding that a class action tort claim against the United States may not proceed without each member of the class having initially satisfied the jurisdictional requirements of the Federal Tort Claims Act, including the requirement that the claim be first presented to the relevant administrative agency); *Lunsford v. United States*, 570 F.2d 221, 223–27 (8th Cir. 1977) (holding that, under the FTCA, a class claim must name the individual claimants, establish the authority of the named claimant or claimants to present claims on behalf of the unnamed class members, state the total amount of the claim for the entire class and otherwise satisfy the jurisdictional requirements); *Dalrymple v. United States*, 460 F.3d 1318, 1325 (11th Cir. 2006) ("The FTCA requires that *each* claim and *each* claimant meet the prerequisites for maintaining a suit against the government.") (citing 28 U.S.C. § 2675(a)) (emphasis in original).

The Court agrees with Plaintiffs and finds that the Notice of Claim here—filed on behalf of "any and all Plaintiffs who have yet to be identified and fit within the potential representative class"—is legally sufficient to support tort claims against New Jersey at this early stage of the litigation. To be clear, the Court declines to dismiss the civil conspiracy claim against New Jersey solely on the ground that potential plaintiffs did not comply with a purported requirement of the NJTCA that is not explicitly set forth on the face of the statute. At the same time, however, the Court is not stating that notice on behalf of a class is sufficient as a matter of New Jersey law under all circumstances. Rather, under the idiosyncratic facts of the case, even though the exact size of the potential class (and whether it can legally be deemed a class at all) was unknown to the State at the time it received the Notice of Claim, the Court finds that the Notice of Claim reasonably

enabled the State to make an adequate investigation of the facts, correct any underlying conditions which gave rise to the claim, at least get a general sense of the potential liability, and to settle the claims without the expense of a lawsuit.[25]

The Court reiterates that its holding here is limited to the proposition that Plaintiffs are merely entitled to offer evidence to support their claim that the State may be liable for an alleged civil conspiracy for the actions of its employees under a theory of *respondeat superior*. (SAC ¶ 424; *see* Part C.2.a, *supra*.) Whether New Jersey is actually liable for civil conspiracy under a theory of *respondeat superior* is a question not currently before the Court, and which New Jersey is entitled to revisit in due course.[26]

## D. Count Three – Violation of New Jersey RICO Statute

Pursuant to New Jersey's RICO statute, N.J.S.A. § 2C:41-1 *et seq.*, it is unlawful to be "employed by or associated with any enterprise engaged in or activities of which affect trade or commerce to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." N.J.S.A. § 2C:41–2(c). To plead a claim for a violation of New Jersey's RICO statute, a plaintiff must allege: "(1) the existence of an enterprise; (2) that the enterprise engaged in activities that affected trade or commerce; (3) that the defendant was employed by or associated with the enterprise; (4) that the defendant participated in the conduct of the affairs of the enterprise; (5) that the defendant participated through a pattern of racketeering activity; and (6) that the plaintiff was injured as a

---

[25] Tellingly, New Jersey does not contend that it would have been more likely to settle the claims if only it had known the exact makeup of the potential class of Plaintiffs in April 2014.

[26] The Court acknowledges that Plaintiffs did not wait the requisite six months prior to filing suit. However, the Court declines to dismiss the SAC on this ground, because the State has not alleged any prejudice resulting from the error, and dismissing the SAC would only consume more of the Court's and litigants' resources. *See Guerrero v. Newark*, 216 N.J. Super. 66, 74 (App. Div. 1987) (declining to dismiss complaint for failure to comply with six-month waiting period).

result of the conspiracy." *Slimm v. Bank of Am. Corp.*, No. 12-cv-5846-NLH, 2013 WL 1867035, at *19 (D.N.J. May 2, 2013) (citations omitted).

A claim brought pursuant to NJ RICO is subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b). *Lum v. Bank of Am.*, 361 F.3d 217, 223 (3d Cir. 2004), *abrogated in part on other grounds by Twombly*, 550 U.S. at 557; *Fimbel v. Fimbel Door Corp.*, 2014 WL 6992004, at *6 (D.N.J. Dec. 10, 2014) ("Courts have held that a claimant pleading a NJRICO violation must comport with Rule 9(b)'s heightened pleading requirements for fraud.").

"Under the RICO Act, 'enterprise' is an element separate from the 'pattern of racketeering activity,' and . . . the State must prove the existence of both in order to establish a RICO violation." *State v. Ball*, 141 N.J. 142, 161–62 (1995). The enterprise requirement under NJ RICO requires a common purpose and an ascertainable structure "support[ing] the inference that the group engaged in carefully planned and highly coordinated criminal activity." *Id.* at 162. In addition, "the pattern of racketeering activity and the activity criminalized under RICO should be, or threaten to be, ongoing . . . . [S]ome degree of continuity, or threat of continuity, is required and is inherent in the 'relatedness' element of the 'pattern of racketeering activity.'" *Id.* at 167–68.

In construing NJ RICO, courts "heed federal legislative history and case law . . . ." *Id.* at 156; *see also Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 510 (3d Cir. 2006); *Interchange State Bank v. Veglia*, 286 N.J. Super. 164 (App. Div. 1995) (noting that when New Jersey case law is silent, "parallel federal case law is an appropriate reference source to interpret the RICO statute").

The Court previously dismissed this claim on grounds that it failed to meet the heightened pleading requirements of Rule 9(b). (6/29/15 Op. at 14–15.) Notably, the Court concluded that the CAC

44

> failed to set forth any facts which would establish the existence of
> an enterprise that is separate and apart from the alleged pattern of
> racketeering activity as . . . required under the law. In addition,
> Plaintiffs have failed to allege any facts to support an allegation that
> there is an ongoing RICO pattern. Further, Plaintiffs' CAC is
> devoid of any allegation that there were two predicate acts of
> racketeering as required by N.J.S.A. 2C:41-1(a).

(*Id.* at 15.) Accordingly, the Court dismissed Plaintiffs' NJ RICO claim without prejudice. (*Id.*)

In the SAC, Plaintiffs allege that, after Mayor Sokolich declined to endorse Governor Christie's bid for re-election, Kelly, Baroni, Wildstein, and Drewniak "jointly planned and agreed to unlawfully reduce the number of Fort Lee's access lanes and toll booths to the [GWB] from three to one in order to cause major traffic problems in and around the Borough of Fort Lee and damage [P]laintiffs." (SAC ¶ 324.) To "maximize the impact" of the lane reductions on Plaintiffs, Kelly, Baroni, Wildstein, and Drewniak agreed to implement the lane and toll both reductions on the first day of school in Fort Lee, without advance warning, and to maintain "radio silence" with respect to any and all inquiries from Mayor Sokolich and other Fort Lee officials regarding the closures. (*Id.* ¶¶ 325–27, 341–42.) In addition, Kelly, Baroni, Wildstein, and Drewniak agreed to use the cover story of a traffic study. (*Id.* ¶ 328.) Kelly further conveyed to other New Jersey employees that Mayor Sokolich was disfavored. (*Id.* ¶¶ 329–30.) In accordance with the plan, Wildstein, with the approval of Kelly, Baroni, and Drewniak, caused the GWB maintenance staff to implement and maintain the lane closures from September 9, 2013, through September 13, 2013, such that only one lane of access was available. (*Id.* ¶¶ 331–40.) After the local access lanes and toll booths were restored, Baroni, Kelly, Wildstein, and Drewniak "continued their association and participation in order to cover-up their unlawful conduct and further their traffic study cover story." (*Id.* ¶¶ 343–47.)

45

The SAC pleads two alternative NJ RICO enterprises. The SAC alleges that Defendants New Jersey, CCFG, and Port Authority—"through their respective agents and employees" Baroni, Kelly, Wildstein, and Drewniak—or, alternatively Baroni, Kelly, Wildstein, and Drewniak themselves were

> associated in fact for the common purpose of retaliating against Mayor Sokolich and others in the Fort Lee area for failing to endorse Governor Christie's re-election bid and effectuating their political vengeance against Mayor Sokolich by causing massive traffic congestion in and around Fort Lee so as to deprive [Plaintiffs] of their federal and state constitutional rights as well as their civil rights, including the rights to interstate travel, intrastate travel, substantive due process, and equal protection, and "to be falsely imprisoned" and "falsely restrained" in their vehicles, and, thus, were an "enterprise" pursuant to the New Jersey RICO Act, N.J.S.A. [§] 2C:41-1 et seq.

(*Id.* ¶¶ 348, 349.) The purported "enterprise" is alleged to have "engaged in trade or commerce in New Jersey or affected trade or commerce in New Jersey." (*Id.* ¶¶ 350, 351.) The SAC additionally alleges that New Jersey, CCFG, and Port Authority—"through their agents and employees" Baroni, Kelly, Wildstein, and Drewniak—were "employed and/or associated with the enterprise as they each engaged or participated directly or indirectly in the affairs of the enterprise as alleged herein" and alternatively alleges that Baroni, Kelly, Wildstein, and Drewniak themselves were "employed and/or associated with the enterprise as they each engaged or participated directly or indirectly in the affairs of the enterprise as alleged herein." (*Id.* ¶¶ 352, 353.) Furthermore, the SAC alleges that New Jersey, CCFG, and Port Authority—"through their agents and employees" Baroni, Kelly, Wildstein, and Drewniak—"each engaged in managerial or supervisory roles or exercised control and direction over the goals, or over the methods used to achieve the goals, of the enterprise," and also that Baroni, Kelly, Wildstein, and Drewniak

themselves "all engaged in managerial or supervisory roles or exercised control and direction over the goals or over the methods used to achieve the goals, of the enterprise." (*Id.* ¶¶ 354, 355.)

The SAC purports to allege a pattern of racketeering activity. (*Id.* ¶ 365.) According to the SAC, Baroni, Kelly, Wildstein, and Drewniak—on behalf of Port Authority, CCFG, and New Jersey—"conspired to violate and/or violated" certain criminal statutes. For example, the SAC alleges a violation of 18 U.S.C. § 666(a)(1)(A) each day the GWB access lanes were misapplied, and that each violation constitutes an incident of racketeering activity. (*Id.* ¶¶ 356, 357.) In addition, the SAC identifies five emails, which allegedly constitute wire fraud under 18 U.S.C. § 1343, as incidents of racketeering activity (*id.* ¶¶ 358–63), and also alleges that Kelly committed an incident of racketeering activity when she requested that IGA employee Renna destroy "their September 12, 2013 email exchange," allegedly in violation of 18 U.S.C. § 1512 and N.J.S.A. § 2C:28–5. (*Id.* ¶ 364.) Plaintiffs further allege that Kelly, Wildstein, Baroni, and Drewniak "violated other criminal statutes, including conspiracy against/deprivation of civil rights, 18 U.S.C. § 241, 242 and Official Misconduct, N.J.S.A. [§] 2C:30-2" and that racketeering activity was performed in "furtherance of the RICO enterprise's objective to retaliate against Mayor Sokolich and injure [P]laintiffs" and "included the same participants and methods of commission." (*Id.* ¶¶ 366, 367.) The SAC alleges that all Defendants "aided and abetted the aforementioned instances of racketeering by acting pursuant to a common design with and/or providing substantial assistance or encouragement as alleged herein." (*Id.* ¶ 368.)

The SAC further alleges a conspiracy to violate NJ RICO, pleaded in the alternative as to the Individual Defendants and the Entity Defendants. (*Id.* ¶¶ 369, 70.) Specifically, the SAC first alleges that New Jersey, CCFG, and Port Authority, "through their respective agents and employees, defendants Baroni, Kelly, Wildstein, and Drewniak" conspired to violate NJ RICO (*id.*

¶ 369), but alternatively alleges that Baroni, Kelly, Wildstein, and Drewniak themselves conspired to do the same (*id.* ¶ 370), in that Defendants "were aware of and agreed to participate in the alleged RICO enterprise, and they all knowingly agreed to commit and/or aid the other members of the enterprise to commit the racketeering activities detailed herein." (*Id.* ¶¶ 369, 370.)

With respect to damages, Plaintiffs allege that they were "prevented from travelling to, through and from the Borough of Fort Lee, and across the [GWB] which caused them to suffer loss and injury to property such as loss of gas, loss of time, including lost wages, and other economic losses." (*Id.* ¶ 371.)

Finally, Plaintiffs allege that, to the extent they are not directly liable, New Jersey, CCFG, and Port Authority are responsible for the individual defendants' actions, misconduct, and violations of NJ RICO under the doctrine of *respondeat superior*. (*Id.* ¶ 372.)

Defendants move to dismiss on various grounds. They generally argue that Plaintiffs again fail to meet the heightened pleading requirements of Rule 9(b) since the allegations improperly lump all of the Defendants together. (*See, e.g.*, PA Mov. Br. at 17–18, CCFG Mov. Br. at 9–12, NJ&MD Mov. Br. at 29–34, Baroni Mov. Br. at 20–21.) More substantively, Defendants contend that Plaintiffs cannot establish an enterprise separate and apart from the alleged "pattern of racketeering," and that the SAC fails to allege multiple incidents of racketeering, or that the pattern is ongoing, since all of the alleged facts relate to a single, overarching act that occurred nearly three years ago. (*See, e.g.*, PA Mov. Br. at 18–20, Wildstein Mov. Br. at 6–7, CCFG Mov. Br. at 12–13, NJ&MD Mov. Br. at 30, Baroni Mov. Br. at 21–22.) In addition, Port Authority argues that Plaintiffs lack standing because they have not alleged facts showing injury to "business or property" as required under N.J.S.A. § 2C:41-4(c) (PA Mov. Br. at 14–16), and Baroni argues that, because Port Authority has not consented to suits seeking recovery of statutory penalties, and

48

because New York does not have a substantially similar statute, NJ RICO does not apply to Port Authority (and by extension Baroni). (Baroni Mov. Br. at 18–19.)

In opposition, Plaintiffs argue that the SAC contains sufficient facts and allegations to withstand the motions to dismiss. (Pl. Opp. Br. at 94–118.) Specifically, Plaintiffs contend that the SAC sufficiently establishes the existence of an enterprise (*id.* at 96–104), that the enterprise was engaged in or affected interstate commerce (*id.* at 104), that Defendants were employed by or associated with the enterprise and participated in its affairs (*id.* at 104–07), that they engaged in a pattern of racketeering activity (*id.* at 107–12), and conspired to violate NJ RICO (*id.* at 112–14), and that Plaintiffs sustained damages proximately caused by the violations (*id.* at 114–16). In addition, Plaintiffs contend that even if the Court determines that the SAC does not establish a direct NJ RICO claim against New Jersey, Port Authority, and CCFG, these entities are nevertheless liable under the doctrine of *respondeat superior.* (*Id.* at 116–18.)

Although the Court believes there are numerous deficiencies with the NJ RICO claim as pled,[27] the Court shall dismiss the NJ RICO claim *with prejudice* for failure to sufficiently establish a pattern of racketeering activity.

As noted, to state a claim under NJ RICO, a plaintiff must establish that the defendants participated in the enterprise through a "a pattern of racketeering activity." N.J.S.A. § 2C:41–2(c). The statute defines "pattern of racketeering activity" as requiring

> (1) Engaging in at least two incidents of racketeering conduct one of which shall have occurred after the effective date of this act and the last of which shall have occurred within 10 years (excluding any

[27] For example, the Court is not convinced that Plaintiffs have sufficiently pleaded an injury to business or property or causation under the heightened requirements of Rule 9, or that the Port Authority is subject to suit. Because the Court believes that this Count must be dismissed *with prejudice* for failure to sufficiently plead the "pattern of racketeering activity" element as a matter of law, the Court declines to substantively analyze these other issues at this time.

> period of imprisonment) after a prior incident of racketeering
> activity; and
> (2) A showing that the incidents of racketeering activity embrace
> criminal conduct that has either the same or similar purposes,
> results, participants or victims or methods of commission or are
> otherwise interrelated by distinguishing characteristics and are not
> isolated incidents.

*Id.*

In the seminal *State v. Ball* decision, the Supreme Court of New Jersey construed "pattern of racketeering activity" as constituting both "relatedness" and "continuity." 141 N.J. 142, 163–69 (1995). Although the New Jersey Supreme Court determined that "continuity" is not an analytically distinct requirement, it made clear that it is an element of "relatedness." *Id.* at 168. Indeed, the Court specifically concluded that "some degree of continuity, or threat of continuity, is *required* and is *inherent* in the 'relatedness' element of the pattern of racketeering activity.'" *Id.* (emphasis added). Significantly, in reaching this conclusion, the Court noted that NJ RICO "expressly enjoins" application to "isolated criminal incidents." *Id.* at 168. "[S]hort-term criminal activity, to be covered, must encompass incidents of criminal conduct that are not disconnected or isolated. Incidents of racketeering that occur sequentially, to overcome any inference that they are totally disconnected or isolated, must exhibit some temporal connection or continuity." *Id.* at 169.

Accordingly, the *Ball* Court adopted a "'totality of the circumstances' approach in applying the federal 'continuity plus relationship' test for determining the existence of a pattern of racketeering activity." *Id.* (citations omitted). As indicated in *Ball*, relevant factors include: "the number of unlawful acts, the length of time over which the acts were committed, the similarity of the acts, the number of victims, the number of perpetrators, and the character of the unlawful activity." *Barticheck v. Fidelity Union Bank/First Nat'l State*, 832 F.2d 36, 39 (3d Cir. 1987); *see also Ball*, 141 N.J. at 169 (reiterating that "the primary criterion of New Jersey's 'pattern of

50

racketeering' is 'relatedness.' That calls for the application of a broad standard involving the totality of all relevant circumstances, which may include 'continuity.'").

Here, the NJ RICO claim is based on a single, overarching scheme: the creation of traffic problems in Fort Lee by reducing the access lanes and toll booths to the GWB, as retribution for Mayor Sokolich's failure to endorse Governor Christie's re-election bid. (*See* SAC ¶¶ 324, 348, 349.) And although Plaintiffs allege that they were victims of the scheme, it is clear that the motivating force and primary victim was designed to be Mayor Sokolich. (*Id.* ¶ 324.) Defendants agreed to create the traffic on or about August 13, 2013, but delayed its creation in order to maximize the impact. (*Id.* ¶¶ 324–27.) Plaintiffs allege that, in order to execute the overarching scheme, Defendants committed multiple unlawful acts, including wire fraud, witness tampering, and misapplication of government property. (*Id.* ¶¶ 356–66.) The traffic itself lasted less than five days, from the morning of September 9, 2013, through the morning of September 13, 2013. (*Id.* ¶¶ 339, 340.) Plaintiffs do not allege that the predicate acts raised a threat of continued racketeering activity.

Even construing the allegations in a light most favorable to Plaintiffs, the Court concludes that they have failed to establish a "pattern of racketeering activity." Tellingly, Plaintiffs do not cite to any case law to support their proposition that a "pattern of racketeering activity" within the meaning of NJ RICO can be predicated on such a finite and focused scheme. To be sure, unlike the federal statute, NJ RICO was not concerned only with "long-term" criminal activity. *Ball*, 141 N.J. at 169. However, "short-term criminal activity" is covered by NJ RICO only if it "encompass[es] incidents of criminal conduct that are not disconnected or isolated." *Id.* Although Plaintiffs allege multiple unlawful acts that were committed in furtherance of the scheme (*see* SAC ¶¶ 356–66.), it defies commonsense to view the lane closures—including the planning stages and

the fallout—as anything other than an isolated, one-off event that, once uncovered, had no risk of continuing. At best, the scheme here lasted five months, from August 2013 (the date of the alleged agreement to create traffic in Fort Lee) until January 2014 (when the last of the individual Defendants named in the SAC resigned). More realistically—as the scheme's sole purpose was to create traffic problems in Fort Lee—it lasted for less than five days, from the morning of September 9, 2013 (when the access lanes and toll booths were reduced from three to one) to the morning of September 13, 2013 (when they were restored). The Court finds that, under the unique facts of this case, this is not enough to demonstrate a "pattern of racketeering activity" within the meaning of NJ RICO. *See Rolls-Royce Motor Cars, Inc. v. Schudroff*, 929 F. Supp. 117, 127 (S.D.N.Y. 1996) (citing *Ball* and dismissing NJ RICO claims which were "based on a single set of transactions that occurred over less than three months and posed no threat of future racketeering activity"). When viewing the totality of the relevant circumstances, the Court concludes that Plaintiffs are improperly attempting to slice up a single, short-lived event in order to create a RICO cause of action. The Court reaches this conclusion, mindful that the pattern of racketeering activity "should be, or threaten to be, ongoing" and that "some degree of continuity, or threat of continuity, is required and is inherent" in the analysis. *Ball*, 141 N.J. at 167, 168. Accordingly, the Court shall dismiss this claim *with prejudice*.[28]

## E. Count Seven – Violation of New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1

To state a claim pursuant to the New Jersey Consumer Fraud Act ("NJCFA"), a plaintiff must generally allege three elements: (1) unlawful conduct, (2) an ascertainable loss, and (3) a

---

[28] For the same reasons, the Court also finds that the SAC cannot allege an enterprise that is separate and distinct from the pattern of racketeering. *See Ball*, N.J. at 161–62 ("'[E]nterprise' is an element separate from the 'pattern of racketeering activity[.]'"). When viewing the allegations of the SAC holistically, it is not possible for the Court to decipher any meaningful difference between the purported enterprise and the pattern, since they are both based on the same short-term, isolated event.

causal relationship between the defendants' unlawful conduct and the plaintiffs' ascertainable loss. *See Bosland v. Warnock Dodge, Inc.*, 197 N.J. 543, 557 (2009) (citations omitted). The broad definition of unlawful conduct covers affirmative acts and knowing omissions, as well as regulatory violations. *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 17 (1994). When the alleged unlawful act consists of an affirmative act, "intent is not an essential element and the plaintiff need not prove that the defendant intended to commit an unlawful act. However, when the alleged consumer fraud consists of an omission, the plaintiff must show that the defendant acted with knowledge, and intent is an essential element of the fraud." *Id.* at 17–18 (internal citations omitted). While a "breach of warranty or contract is unfair to the non-breaching party," a breach of warranty alone is not a *per se* unlawful practice. *Id.* A claim under the NJCFA requires more; it requires that a plaintiff allege "substantial aggravating circumstances." *Suber v. Chrysler Corp.*, 104 F.3d 578, 587 (3d Cir. 1997); *see also Cox*, 138 N.J. at 18. To meet this standard, a plaintiff must demonstrate that the business behavior in question "stand[s] outside the norm of reasonable business practice in that it will victimize the average consumer . . . ." *Turf Lawnmower Repair, Inc. v. Bergen Record Corp.*, 139 N.J. 392, 416 (1995).

Additionally, to adequately state a claim under the CFA, not only must a plaintiff allege facts sufficient to establish the aforementioned elements, but such allegation must be pled with particularity pursuant to Rule 9(b) of the Federal Rules of Civil Procedure. *See Smajlaj v. Campbell Soup Co.*, 782 F. Supp. 2d 84, 89 (D.N.J. 2011). These requirements may be satisfied "by pleading the date, place or time of the fraud, or through alternative means of injecting precision and some measure of substantiation into [the] allegations of fraud." *Lum v. Bank of Am.*, 361 F.3d 217, 224 (3d Cir. 2004) (internal quotations omitted).

The Court previously dismissed this claim without prejudice because it failed to meet the heightened pleading requirements of Rule 9(b) and "fail[ed] to set forth any facts which would establish a causal connection between Defendants' alleged unlawful conduct and Plaintiffs' ascertainable loss." (6/29/15 Op. at 18.)

The NJCFA claim is asserted against Port Authority, Baroni, and Wildstein, and in essence, alleges that they made misrepresentations in connection with collecting a toll to cross the GWB. First, Plaintiffs allege that Port Authority's receipt and collection of tolls paid by Plaintiffs to travel over the GWB "constituted a business transaction and/or commerce" and that Port Authority's "grant of access and the right to travel over the [GWB] in exchange for the payment of tolls constitute 'merchandise'" within the meaning of the NJCFA. (SAC ¶¶ 427–29.) Plaintiffs allege that Defendants Baroni, Wildstein, and Port Authority committed "unfair and unconscionable commercial practices" under the NJCFA, because the lane closures "altered the nature and quality of the expected service, good, and/or travel access that defendant Port Authority regularly provided and should have provided by substantially altering motorists' travel and wait times and required plaintiffs to pay tolls under a subterfuge." (*Id.* ¶ 438). Plaintiffs further claim that the Defendants' "failure to inform or warn plaintiffs" of the closures and the policy of "radio silence" in response to inquiries about the closures "constitute material omissions and/or misrepresentations under the New Jersey Consumer Fraud Act." (*Id.* ¶ 439.). The traffic congestion was "not anticipated or bargained for" by the plaintiffs, which "reduced and/or eliminated the value of plaintiffs' and the plaintiff class members' respective purchases and constituted an unconscionable and deceptive commercial practice." (*Id.* ¶ 441). Defendants' intentional concealment of the closures prohibited plaintiffs from taking alternate routes "which they would have done had they known of the . . . unfair commercial practices and effectively deprived them of any choice in connection with the

54

respective purchases." (*Id.* ¶ 442). Plaintiffs claim that they "sustained ascertainable loss in the form of the tolls paid under false pretenses and related expenses which include economic damages, such as loss of gas and loss of time." (*Id.* ¶ 443.)

Defendants move to dismiss Count Seven on various grounds. First, they argue that the allegations are too conclusory to meet Rule 9(b)'s heightened pleading requirements. (*See* PA Mov. Br. at 22–25, Baroni Mov. Br. at 22–23.) Furthermore, they argue that Plaintiffs cannot establish ascertainable loss: once they reached the toll both, they had already passed through the traffic; and once they paid the toll, they received exactly what they paid for—passage across the GWB. (*Id.*) Additionally, Defendants argue that paying a toll to cross a bridge does not qualify "merchandise" within the meaning of the NJCFA. (*See, e.g.*, PA Mov. Br. at 22–25, Wildstein Mov. Br. at 8, Baroni Mov. Br. at 23–24.) Finally, Port Authority and Baroni further argue that the NJCFA does not apply as a matter of law against them because New York does not have a substantially similar statute, and Port Authority has not consented to suits seeking recovery of statutory penalties. (PA Mov. Br. at 22–25, Baroni Mov. Br. at 18–19.)

In opposition, Plaintiffs contend that they have sufficiently pled this claim. (Pl. Opp. Br. at 82–94.) First, they argue that they have met the heightened pleading requirements, including the allegation that the right to access and travel over the GWB through a payment of a toll constitutes "merchandise" within the NJCFA. (*Id.* at 83–86.) Second, Plaintiffs assert that they have sufficiently pled ascertainable loss. (*Id.* at 86–89.) Finally, Plaintiffs argue that New York has sufficiently similar legislation, such that the Defendants are subject to suit under the NJCFA. (*Id.* at 86–94.)

The Court agrees with Defendants that Count Seven fails to state a claim because the payment of a toll in exchange for the right to travel over the GWB does not constitute

55

"merchandise" within the meaning of the NJCFA. As noted, to successfully state a claim under the NJCFA, a Plaintiff must allege unlawful conduct. *See Bosland*, 197 N.J. at 557. Unlawful conduct is defined in relevant part as "any unconscionable commercial practice . . . in connection with the sale . . . of any merchandise . . . ." N.J.S.A. § 56:8–2. The NJCFA defines "merchandise" as including "any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale[.]" N.J.S.A. § 56:8-1. "Although that definition is interpreted broadly to protect consumers from a wide variety of abhorrent deceptive practices, it has meaningful limits. Whether a 'service' meets the definition of 'merchandise' . . . turns on the purpose and nature of that 'service.'" *D'Agostino v. Maldonado*, 216 N.J. 168, 187 (2013) (citation and internal quotation marks omitted).

The right to travel across the GWB in exchange for payment of a toll is not "merchandise" within the meaning of the NJCFA since it is not a service that is offered to the public for sale. Rather, "the issuance of the toll ticket is a license to the bearer to travel unmolested on the" GWB. *See Isquith v. N.Y. State Thruway Auth.*, 27 Misc. 2d 539, 542, 215 N.Y.S.2d 393 (Ct. Cl. 1961). Payment of a toll in exchange for the right to cross the GWB is not the type of "consumer oriented commercial transaction" that was intended to be covered by the Legislature in passing the NJCFA. *See Del Tufo v. Nat'l Republican Senatorial Comm.*, 248 N.J. Super. 684, 688, 591 A.2d 1040 (Ch. Div. 1991) (holding that the NJCFA "is intended to encompass only consumer oriented commercial transactions involving the marketing and sale of merchandise or services"). Even construing the SAC in a light most favorable to Plaintiffs, it is clear that Port Authority is providing a governmental service that is not properly covered under the NJCFA. *See also Bey v. Bruey*, No. 09-1092-JBS, 2009 WL 961411, at *7 (D.N.J. Apr. 8, 2009) (allegations that employees of the Clerk's Office of the United States District Court for the District of New Jersey failed to enter

default against a defendant did not amount to a claim under the NJCFA since at issue were "governmental services . . . not offered to the public for sale").

Although not directly on point, the decision authored by Judge Gibson in *Barry by Ross v. N.J. State Highway Auth.*, in which he determined that the NJCFA did not apply to the sale of Garden State Parkway tokens, is illuminating. 245 N.J. Super. 302 (Ch. Div. 1990). In that case, the Atlantic County Division of Consumer Affairs brought suit against the operator of the Garden State Parkway, the New Jersey State Highway Authority (the "Authority"). Plaintiff alleged that the Authority advertised that Parkway tokens could be purchased at a discount price for a specific time then fraudulently breached that promise by failing to make the tokens available in sufficient quantities to meet the reasonably anticipated consumer demands. *Id.* at 304–05. The issue before the chancery court was whether the NJCFA applied to such a claim. *Id.* Judge Gibson determined that the NJCFA did not apply. The court first examined the nature of the Authority, and concluded that because it was a quasi-public entity, it was not subject to suit under the NJCFA. *Id.* at 306–08. Next—and most relevant to the facts presently before this Court—the chancery court concluded that

> it is difficult to see how the Authority's sale of tokens or its promotion of a discount can be fairly viewed as the type of sale or "merchandise" contemplated by the Consumer Fraud Act. . . . Parkway tokens are by nature *sui generis*. They have but one use, there is a single seller and their sale is not for profit. In effect, tokens are simply a prepayment for the right to enjoy a particularized governmental service, in this case, travel on a limited access state highway. My judgment therefore is that tokens do not constitute "merchandise" under this Act.

*Id.* at 308; *see also Schlichtman v. N.J. Highway Auth.*, 243 N.J. Super. 464, 470 (Law Div. 1990) (holding that the NJCFA "does not create a cause of action" for claims against the Authority for

failure to meet the unanticipated demand for Parkway tokens, and noting that *Barry by Ross* had decided the issue).

This Court reads *Barry by Ross* (and *Schlichtman*) as standing for the proposition that providing access to a public road in exchange for payment is a governmental service that is not covered by the NJCFA. The Court concludes that the New Jersey legislature did not intend for the NJCFA to cover the payment of a toll in exchange for the right to travel over the GWB, much like the Parkway tokens at issue in *Barry by Ross* and *Schlichtman*. In sum, Plaintiffs fail to state a claim under the NJCFA because they have not established unlawful conduct in connection with the sale of "merchandise." *See Bosland*, 197 N.J. at 557 ("unlawful conduct" within the meaning of the NJCFA is a "prerequisite to suit"); N.J.S.A. § 56:8–2. "Port Authority's grant of access and the right to travel over the George Washington Bridge in exchange for the payment of tolls" (SAC ¶ 429) does not constitute "merchandise" within the meaning of the NJCFA. Accordingly, the Court shall dismiss Count Seven *with prejudice*.

## F.  Count Eight – Breach of Contract and Implied Covenant of Good Faith and Fair Dealing

To establish a breach of contract claim under New Jersey law, a plaintiff must show that: (1) the parties entered into a valid contract, (2) the defendant did not perform his or her obligations under the contract, and (3) the plaintiff suffered damages as a result. *See Murphy v. Implicito*, 392 N.J. Super. 245, 265 (App. Div. 2007). A "covenant of good faith and fair dealing is implied in every contract." *See Wilson v. Amerada Hess Corp.*, 168 N.J. 236, 244 (2001) (citation omitted). This covenant requires that no party to a contract "shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Seidenberg v. Summit Bank*, 348 N.J. Super. 243, 254 (App. Div. 2002) (quotation marks and citation omitted). To prevail on a breach of contract claim grounded on an alleged breach of the implied covenant of

good faith and fair dealing, a plaintiff must establish that the defendant (1) acted with bad motives or intentions or engaged in deception or evasion in the performance of contract; and (2) by such conduct, denied the plaintiff of the bargain initially intended by the parties. *See Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assoc.*, 182 N.J. 210, 225 (2005).

The Court previously dismissed this claim without prejudice because the CAC failed to allege any facts establishing the existence of "a contract with the Port Authority, whether it was an express or implied contract, what were the terms of that contract, what were the obligations of each party, whether Plaintiffs performed their duties under the contract and whether Plaintiffs sustained any damages as a result of Defendant's breach." (6/29/15 Op. at 19.)

In the SAC, Plaintiffs allege that "[b]efore, during, and after September 9, 2013 through September 13, 2013" they "paid a toll to defendant Port Authority in exchange for the ordinary, regular and unmolested access" to the GWB, and that "[i]n exchange for said payment, defendant Port Authority agreed to grant such access, which created express and/or implied contracts . . . ." (SAC ¶¶ 446, 447.) Plaintiffs allege that by reducing access to the GWB between September 9, 2013, through September 13, 2013, Port Authority "significantly departed from the access . . . regularly provided, and which [Plaintiffs] expected and paid for" to amount to a breach of contract, and a breach of the implied covenant of good faith and fair dealing. (*Id.* ¶¶ 450, 452.)

Port Authority moves to dismiss on various grounds. (PA Mov. Br. at 25–27.) First, Port Authority argues that the same conduct cannot be used to establish both a breach of contract and a breach of the implied covenant of good faith and fair dealing, since they are independent claims. Second, it argues that payment of a toll does not establish a contract; rather, it is a license to utilize the bridge. Third, even if a contract is formed with payment of a toll, reduction of access lanes prior to tollbooths cannot establish a breach, since no contract has been formed at that time. Fourth,

since no contract is formed prior to payment of the toll, there can be no violation of the covenant of good faith and fair dealing prior to formation of the contract. Plaintiff opposes on grounds that they have sufficiently pleaded claims for both breach of contract and breach of the implied covenant of good faith and fair dealing. (Pl. Opp. Br. at 76–81.)

The Court agrees with Port Authority. Payment of a toll to cross a bridge may well entitle the payor to passage over that bridge within a reasonable time. But without something more, payment of a toll does not provide for some indefinite, undefined, future right of "access" to the toll booth. *See Phx. Fin. Corp. v. Iowa-Wisc. Bridge Co.*, 41 Del. 130, 134–35 (Del. Super. 1940) (holding that where bridge toll ticket contains no terms of agreement, "it constitutes a token, receipt or voucher showing the payment of the fare, and that pursuant to the contract then made the holder of the ticket is entitled to the passage"); *Isquith*, 27 Misc. 2d at 542 (Ct. Cl. 1961) (holding that "the issuance of the toll ticket is a license to the bearer to travel unmolested on the [infrastructure in question]" and can be construed as an executory contract to the extent it "is a way of determining how far he has travelled and how much he owes").

Here, Plaintiffs state in conclusory fashion that by paying a toll to Port Authority to cross the GWB, a contract was created whereby Port Authority agreed to provide "ordinary, regular and unmolested access to the [GWB]." (SAC ¶ 446.) The basis for such an allegation is unclear. Indeed, to the extent this Court could construe the payment of a toll in exchange for the right to cross the GWB as a contract, it is clear that the contract was not formed until after Plaintiffs had cleared the traffic which Plaintiffs allege to be in breach of the contract. In other words, there can be no breach of contract, or breach of the implied covenant of good faith and fair dealing, prior to the creation of the purported contract (*i.e.*, the payment of the toll). Plaintiffs do not allege that they were impeded in crossing the GWB itself; their allegations are limited to reduction in access

lanes to the toll booths where they would enter into the purported contract, and the resulting traffic in Fort Lee. (*See* SAC ¶¶ 28, 88, 112.) In the absence of something more, the Court cannot construe the payment of the toll as granting Plaintiffs an indefinite, undefined, future right to "access" to the GWB toll booth. Accordingly, the Court shall dismiss this count *with prejudice*.

## G. Count Nine – Tortious Interference

"The tort of interference with a business relation or contract contains four elements: (1) a protected interest; (2) malice—that is, defendant's intentional interference without justification; (3) a reasonable likelihood that the interference caused the loss of the prospective gain; and (4) resulting damages." *DiMaria Const., Inc. v. Interarch*, 351 N.J. Super. 558, 567 (App. Div. 2001), *aff'd*, 172 N.J. 182 (2002) (citing *MacDougall v. Weichert*, 144 N.J. 380, 404 (1996)). "New Jersey recognizes that the tortious interference with prospective economic benefit or advantage cause of action is separate and distinct from tortious interference with an existing contract." *Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*, No. 10-453-FLW, 2010 WL 5239238, at *4 (D.N.J. Dec. 16, 2010) (citing *Printing Mart-Morristown v. Sharp Elecs. Corp.*, 116 N.J. 739, 751 (1989) (exploring claim for tortious interference with prospective economic advantage as distinct from claim for tortious interference with contract)). The primary difference between these two related torts is the existence of a contract, rather than merely a reasonable expectation of an agreement. *Coast Cities Truck Sales, Inc. v. Navistar Intern. Transp. Co.*, 912 F. Supp. 747, 772 (D.N.J. 1995).

61

Plaintiffs allege this cause of action for the first time in the SAC.[29] Plaintiffs allege that in exchange for payment of the toll to cross the GWB, Port Authority agreed to grant "ordinary, regular and unmolested access to the [GWB]," which "created express and/or implied contracts" between Port Authority and Plaintiffs. (SAC ¶¶ 457, 458.) Additionally, Plaintiffs allege that "Port Authority's regular practice of providing ordinary, regular and unmolested access to the George Washington Bridge created the existence of a reasonable expectation of economic advantage and/or benefit belonging" to Plaintiffs. (*Id.* ¶ 459.) Plaintiffs allege that Defendants Wildstein, Baroni, Kelly, Drewniak, New Jersey, and CCFG had knowledge of these contracts and/or the reasonable expectation of economic advantage, and that they tortiously interfered with the contracts and/or reasonable expectation of economic advantage between Plaintiffs and Port Authority by reducing the amount of access lanes and toll booths available to motorists attempting to cross the GWB from Fort Lee. (*Id.* ¶ 465.)

Defendants move to dismiss first and foremost on grounds that Plaintiffs have failed to demonstrate a protected interest—either a contract or a prospective economic advantage. (*See* CCFG Mov. Br. at 14–16, Baroni Mov. Br. at 25–27.) In opposition, Plaintiffs contend that they have sufficiently pleaded both causes of action. (Pl. Opp. Br. at 65–69.)

The Court agrees with Defendants. First, the Court finds that the claim for tortious interference with contract must be dismissed *with prejudice*, since the Court has already determined that Plaintiffs cannot establish a contract between themselves and Port Authority

---

[29] Wildstein and CCFG both argue that this claim should be dismissed because Plaintiffs added this claim without permission from the Court. (Wildstein Mov. Br. at 9–10, CCFG Mov. Br. at 13.) Plaintiffs acknowledge that they did not seek leave to include this claim in the SAC, but ask the Court to consider the merits of this claim in the interests of efficiency and judicial economy, and also because Defendants cannot demonstrate prejudice from the assertion of the claim. (Pl. Opp. Br. at 65 n.14.) The Court shall consider the claim over Defendants' objections, but reminds Plaintiffs of the importance of following all procedural rules going forward.

sufficient to survive the motions to dismiss. (*See* Part F, *supra*.) Accordingly, any claim for tortious interference with that contract must likewise fail, since Plaintiffs cannot demonstrate a protected contractual interest. *DiMaria*, 351 N.J. Super. at 567.

Second, the Court shall dismiss the claim for tortious interference with prospective economic advantage *without prejudice* because Plaintiffs have failed to sufficiently allege reasonable expectation of economic advantage. *See Printing Mart–Morristown*, 116 N.J. at 751 (holding that a plaintiff must demonstrate that he was in "pursuit of business" in addition to setting forth "allegations of fact giving rise to some 'reasonable expectation of economic advantage'") (citations omitted). Even though the SAC, when construed in a light most favorable to Plaintiffs, may adequately allege that the Taxi Plaintiffs were in "pursuit" of business,[30] the SAC does not sufficiently allege facts demonstrating a reasonable expectation of economic advantage. While courts are generally able to discern a reasonable expectation of economic benefit "[w]ithout searching far," *id.* at 753, the Court cannot do so here. Plaintiffs merely allege, in conclusory fashion, that Port Authority's "regular practice of providing ordinary, regular and unmolested access to the [GWB] created the existence of a reasonable expectation of economic advantage and/or benefit belonging or accruing" to Plaintiffs. (SAC ¶ 459.) However, it is not clear to the Court how the Port Authority's provision of access lanes and toll booths for the Fort Lee entrance to the GWB constitute an "economic advantage" within the ambit of this cause of action, let alone

---

[30] The SAC alleges the Taxi Plaintiffs are "livery, taxi, and/or transportation business[es] that [are] located in New Jersey and transact[] business in New Jersey, including in and around the Borough of Fort Lee, New Jersey and regularly utilize[] the George Washington Bridge." (*See* SAC ¶¶ 8–14). However, the Court notes that it is not clear how the Taxi Plaintiffs were in "pursuit" of business on the relevant dates, or whether Plaintiffs intend to include the "non-Taxi Plaintiffs" (SAC ¶¶ 15, 16) as part of this claim. Should Plaintiffs choose to replead this cause of action, they are advised to make clear which Plaintiffs are potentially part of the claim and how they were in pursuit of business on the relevant dates.

whether Plaintiffs had a "reasonable expectation" to it. Plaintiffs' opposition brief does not meaningfully address the purported reasonable expectation of economic advantage, as it simply repeats the allegations contained in the SAC. (*See* Pl. Opp. Br. at 67.) Because the allegations are conclusory, the Court is unable to substantively analyze the contours of this cause of action further.[31]

Accordingly, the Court must dismiss the claim for tortious interference with prospective economic advantage claim for failure to establish a plausible entitlement to relief on the face of the SAC. *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 570. Such dismissal shall be *without prejudice*. If Plaintiffs wish to replead this cause of action, they shall file a formal motion to amend in accordance with the Federal and Local Civil Rules.

## H. Count Ten – *Respondeat Superior*

"[T]he doctrine of *respondeat superior* does not provide an independent cause of action under New Jersey law." *Rowan v. City of Bayonne*, 474 Fed. Appx. 875, 879 n.3 (3d Cir. 2012) (citing *Carter v. Reynolds*, 175 N.J. 402 (N.J. 2003)).

In previously dismissing this claim, the Court construed it as asserting vicarious superior liability against CCFG, the State, and Port Authority in connection with the alleged NJ RICO violations. The Court dismissed it without prejudice, directing Plaintiffs to "set[] forth a sufficient

---

[31] For example, it is not clear whether Plaintiffs are basing this claim on access to the GWB in and of itself, or if they intend to argue that the traffic created as a result of the lane closures interfered with prospective business, such as taxi fares. To the extent this cause of action is premised on the former theory, the analysis set forth in Part F, *supra*, undermines such a claim. And to the extent it is premised on the latter theory (*i.e.*, prospective taxi fares), "mere hope that the plaintiff would have entered into some future arraignment with the prospective customer is not sufficient." *See Mu Sigma, Inc. v. Affine, Inc.*, No. 12-1323-FLW, 2013 WL 3772724, at *3 (D.N.J. July 17, 2013). Although the foregoing is admittedly *dicta*, the Court advises Plaintiffs to keep it in mind should they choose to replead this cause of action.

factual basis for claims of violations of NJ RICO statute and vicarious liability thereunder."
(6/29/15 Op. at 20.)

In the SAC, Plaintiffs once again assert a stand-alone *respondeat superior* claim against
CCFG, the State, and Port Authority, alleging that they are "responsible for the improper actions
and conduct of their agents, employees, and/or servants under the doctrine of vicarious liability."
(SAC ¶¶ 471–78).

Because it is clear that the there is no independent cause of action for *respondeat superior*
under New Jersey law, the Court shall dismiss this stand-alone cause of action *with prejudice*. The
Court notes that it has addressed the issue of *respondeat superior*, where applicable, in connection
with the underlying claims, thus rendering any stand-alone claim duplicative.

## CONCLUSION

For the reasons set forth above, the Motion to Deny Class Certification is **denied** as
premature and the Motions to Dismiss the SAC are **granted in part and denied in part**:

- Counts One and Four (Section 1983 and NJCRA) shall proceed against the Individual
  Defendants (*i.e.*, Kelly, Drewniak, Baroni, and Wildstein) in their individual capacities,
  and CCFG.

- Counts One, Two, Four, and Five (Section 1983 and NJCRA) shall proceed against Port
  Authority to the extent they are premised on Wildstein and Baroni's possession of "final
  policymaking authority," but shall be dismissed *with prejudice* to the extent premised on a
  failure to train.

- Counts Four and Five (NJCRA) are dismissed *with prejudice* as to Defendant New Jersey.

- Count Six (Civil Conspiracy) shall proceed as to all Defendants.

65

- Counts Three (NJ RICO), Seven (NJCFA), Eight (Breach of Contract), and Ten (*Respondeat Superior*) of the SAC are dismissed *with* prejudice.

- Count Nine (Tortious Interference) is dismissed *with* prejudice to the extent it is based on interference with contract, but is dismissed *without* prejudice to the extent it is based on interference with prospective economic advantage. If Plaintiffs wish to replead Count Nine, they shall file a formal motion to amend in accordance with the Federal and Local Civil Rules.

An appropriate Order accompanies this Opinion.

DATED: September __15__ 2016

JOSÉ L. LINARES
U.S. DISTRICT JUDGE

66